[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Tench,* Slip Opinion No. 2018-Ohio-5205.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-5205

THE STATE OF OHIO, APPELLEE, *v.* TENCH, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Tench,* Slip Opinion No. 2018-Ohio-5205.]

*Criminal law—Aggravated murder—Death sentence affirmed.*

(No. 2016-0899—Submitted July 31, 2018—Decided December 26, 2018.)

APPEAL from the Court of Common Pleas of Medina County, No. 14CR0541.

_____

**DEGENARO, J.**

{¶ 1} Appellant, James D. Tench ("Tench"), murdered his mother, Mary Tench, during the night of November 11 or early morning of November 12, 2013, by means of multiple blows to her head and body with a blunt object. A jury found Tench guilty of aggravated murder with three death specifications (and of other offenses), and he was sentenced to death. Tench appeals as of right from his convictions and death sentence. For the reasons set forth below, we dismiss his conviction for aggravated robbery and the felony-murder specifications that are predicated on aggravated robbery, and we affirm the judgment of the trial court in all other respects, including the sentence of death.

## I. Facts

{¶ 2} Tench and his mother lived at 758 Camden Lane, Brunswick. Mary worked as a nurse's assistant at Ennis Court, a combined assisted-living facility and nursing home in Lakewood. Tench worked at an Old Carolina Barbecue restaurant in Strongsville beginning in January 2013, eventually becoming the assistant general manager. In September 2013, he transferred to another Old Carolina Barbecue restaurant in Fairlawn.

{¶ 3} In June or July of 2013, Tench began dating Christina Kyker. He told her he earned $15 per hour at the restaurant, although in fact his salary was $11 per hour. Nevertheless, he gave her expensive gifts, including jewelry, and never seemed short of money. Between July and September 2013, Tench purchased—but never paid for—$1,355.70 worth of jewelry on a credit card he had fraudulently obtained the previous year with the Social Security number of his recently deceased father.

{¶ 4} Tench owned a Ford F-150 pickup; in the fall of 2013, to economize on fuel, he bought a small Hyundai but kept the truck. His mother drove a silver Ford Escape SUV.

{¶ 5} One day during the summer of 2013, one of the Tenches' neighbors, Noreta Dean, saw Tench leave the house, shout, "Fuck you, bitch," and then get into his truck and drive off at high speed. Mary was in the garage at the time; no one else appeared to be at the Tench residence.

{¶ 6} Mary had a Discover credit card that allowed her to write cash-advance checks. On August 24, 2013, Tench wrote a $300 Discover check to himself on his mother's account and deposited it in his own bank account. Tench later admitted on the witness stand that he had not had permission to do this.

{¶ 7} In August 2013, Mary made a fraud report to Discover Financial Services, stating that her son may have engaged in unauthorized transactions

involving her Discover checks. However, after the company issued her a new account number, she withdrew the claim.

{¶ 8} In October, Tench's thefts accelerated. Between October 6 and 18, he wrote five checks to himself on Mary's First Merit checking account, forged her signature to each, and deposited them in his own bank account. The forged checks totaled $1,150. On October 31, he forged a second Discover check in the amount of $900 and deposited that in his account.

{¶ 9} Meanwhile, Tench's relationship with Mary became increasingly tense. One day in October, Christina Kyker was having breakfast with Tench and his mother at their residence. Mary told her that Tench had been using Mary's credit cards to buy Kyker things. According to Kyker, Mary started taking out envelopes as she discussed the matter, and Tench kept grabbing the envelopes and telling her to stop. However, Mary continued.

{¶ 10} Finally, Tench grabbed Mary by the arm. Kyker described this action as "sudden," "forceful," and "aggressive." According to Kyker, Mary "froze for a minute and looked scared." Then she rose from the table and walked away crying. Kyker followed Tench upstairs and urged him to apologize to his mother. After calming down, Tench did apologize.

{¶ 11} In mid-October, Tench told an Old Carolina Barbecue employee, Sarah Morgan, about an argument he had had with his mother. During this conversation, Tench said he hated his mother. He spoke in an angry and stern voice, giving Morgan the impression that he meant what he was saying. She reported Tench's comment to his supervisor, Juan Parrilla. Parrilla's understanding from Morgan's description was that Tench had said he hated his mother and wished she were dead. Parrilla summoned Tench into his office and admonished him for saying this. According to Parrilla, Tench laughed and replied, "Well, she might as well be." Around the same time, Tench remarked to Old Carolina Barbecue

franchise director Jonathan Casey that his mother was driving him crazy and "he couldn't stay there anymore."

{¶ 12} On October 28, Tench committed an armed robbery of the Old Carolina Barbecue in Strongsville, where he had formerly worked. Wearing a mask and carrying what he later said was a toy gun, he forced two employees into walk-in coolers and forced the manager to give him the code to open the safe. Tench later told Strongsville police that he had deposited the robbery proceeds into his mother's First Merit account.

{¶ 13} On November 1, Mary printed from First Merit's website copies of the five First Merit checks Tench had forged in October; police later found these copies in her bedroom. On a newspaper dated November 1, 2013, she wrote her son's name. She also wrote the numbers, dates, and amounts of the forged checks and added up the total.

{¶ 14} On November 4, Mary made another fraud report to Discover Financial Services. According to Discover's business records, she stated that her son had taken a cash-advance check from her mail (she was referring to the check that Tench forged on October 31) and that she intended to file a police report. Discover sent a confidential e-mail to Mary the next day, but that e-mail was deleted by someone using Tench's cell phone.

{¶ 15} On November 7, Tench forged another check on Mary's First Merit account in the amount of $100.

{¶ 16} The record of this case contains a handwritten document dated November 8, 2013, which was referred to at trial as "the promissory note." The note reads: "I James David Tench intend on paying Mary Tench a minimum of $50.00 every paycheck. Starting 11-15-13." It is signed by Tench. A handwriting expert testified at trial that the words "Starting 11-15-13" were written by Mary and the rest of the note was written by Tench.

{¶ 17} On November 9, Tench went to Home Depot. There he bought two rolls of Nashua No. 394 duct tape, a pair of gloves, a tarpaulin, a bucket, and a set of ratchet straps. He then went to Huntington National Bank, where he had opened an account the week before, with the $100 check he had forged on November 7. He took $50 in cash and deposited the remaining $50 into his account.

## A. The Events of November 11 and Morning of November 12, 2013

{¶ 18} On November 11, Mary worked the 3:00 to 11:00 p.m. shift at Ennis Court. She left for work around 2:00 p.m. A few minutes later, someone used the computer in Mary's bedroom to look at aerial images of Brunswick, including the area near the industrial park where Mary's body would later be found.

{¶ 19} At 3:00 p.m., Christina Kyker left work; Tench was waiting for her there. After driving separately to Kyker's home in Euclid, they went to a shopping mall in Mentor, where they spent a few hours. Between 7:00 and 7:30 p.m., they went back to Euclid and watched television with Kyker's family. Kyker, her parents, and her brother all noticed that Tench was unusually quiet and something seemed to be bothering him.

{¶ 20} At approximately 9:30 p.m., Tench left. Snow was expected, and he expressed concern about the roads. Still, Tench, who visited Kyker frequently, had never left her house so early before, even in bad weather. Usually he stayed until midnight or later and sometimes slept overnight on the couch.

{¶ 21} Mary clocked out of work at 11:13 p.m. Cell-phone records introduced at trial show that Tench called Mary three times after 11:00 p.m., finally reaching her at 11:15. The records show that Mary's phone was used to call Tench's phone at 11:51 p.m.; Tench did not answer. Using the cell-phone records, FBI special agent Jacob Kunkle (an expert in cell-phone-record analysis) later determined that the 11:51 call from Mary's phone bounced off a cell tower near her house, suggesting that she was back in Brunswick and possibly home by 11:51.

{¶ 22} At 1:22 a.m., Tench phoned Kyker, who was asleep and did not answer. He then phoned her brother. Kyker's brother woke her up to take the call. According to Kyker, Tench was "freaking out" because his mother had not come home yet. Tench told her that he had driven to Mary's workplace twice to look for her, once in his car and once in his truck. Tench told Kyker that he was going to try calling his mother's workplace again. In fact, he had never called his mother's workplace, nor did he do so at any time that night. After the call, Tench and Kyker texted back and forth until about 1:50 a.m., and he called her again at 2:00 a.m.

{¶ 23} Between 1:45 and 2:00 a.m., Timothy Slowey, who lived near the Tenches and could see their house from his front yard, was smoking a cigarette outside his house before leaving for work. He testified that he saw Tench's truck pull out of the garage. This was unusual, he said, because Mary's SUV was "always" in the garage; Tench habitually parked in the driveway, and Slowey had never seen his truck in the garage. Slowey did not see Mary's vehicle anywhere that morning.

{¶ 24} Tench's cell-phone records show that between 2:02 and 2:14 a.m., Tench made three calls to Mary's cell phone. These were his first attempts to call his mother since their last conversation at 11:15 p.m.

{¶ 25} At 2:21 a.m., Tench called 9-1-1 and reported that his mother had not arrived home. He told the operator that after speaking to his mother at 11:15 he had fallen asleep and missed a call from her. When he woke up, he said, he "called her phone and * * * didn't get an answer," so he went out and drove around, but could not locate her car either on I-71 or in Brunswick. At 2:27 a.m., he called the Ohio Highway Patrol and asked whether any accidents had been reported on I-71 between Lakewood and Brunswick.

{¶ 26} Between 6:00 and 6:30 a.m., November 12, Timothy Miller noticed a silver SUV in an open field behind his house. The field is adjacent to an industrial park on Carquest Drive in Brunswick. Around noon, employees at one of the

6

businesses in the industrial park noticed the SUV. Eventually the police were called.

{¶ 27} At approximately 7:50 a.m., Tench went to the Brunswick police station, where he reported his mother missing. Tench told Officer Christopher Scafidi that his mother had worked until 11:45 p.m. and had called him at 11:51, but he had missed the call because he was asleep with his girlfriend. He said he woke up about 3:00 a.m. and became alarmed when he found his mother had not yet come home. He said he had gone out and driven the route his mother would have taken from work. Scafidi told Tench not to worry and sent him home.

{¶ 28} Around 8:15 or 8:30 a.m., Tench called Casey. During this conversation, Casey testified, Tench stated that he had called the FBI and was angry because they refused to help. Yet records for Tench's cell phone and landline show no calls to the FBI.

{¶ 29} Around 9:00 a.m., Tench called Raymond Hull, a former general manager of the Old Carolina Barbecue in Strongsville, who had originally hired him and was something of a mentor. Hull testified that Tench had said, " 'I've done something that I need to talk to you about.' " Hull asked what it was. After a long pause, Tench said his mother had not come home the night before, and he asked whether he could come and talk to Hull. Hull told him to come any time after 2:00 p.m. An hour later, Tench called and told Hull, " 'We hired a private detective to come help look for her.' " Hull never heard from Tench again.

## B. The Investigation

{¶ 30} Brunswick police detectives Dean Weinhardt and Brian Schmitt were informed the morning of November 12 that Tench had reported his mother missing. Schmitt knew, and Weinhardt learned that morning, that Tench was a suspect in the Old Carolina Barbecue robbery. Schmitt and Weinhardt began to investigate Mary's disappearance.

**{¶ 31}** They visited Tench at his home around 1:00 p.m. He was in the garage. He agreed to talk to them inside the house. As they went in, Schmitt noticed a pair of boots that had mud and long blades of green and brown grass on them. He also noted that the dryer was running and a basket of wet towels was sitting on it.

**{¶ 32}** Tench told the detectives that he had spoken with his mother at 11:15 p.m. the night before and then fallen asleep. Waking up at 2:00 a.m., he found that he had missed his mother's call at 11:51. He became worried because she had not arrived home yet, so he got into his truck and went out looking for her. He said he had driven up I-71, turned around at 150th Street, and returned on I-71. He also told the detectives that his mother had left work at 11:45 p.m.

**{¶ 33}** Schmitt mentioned the condition of Tench's boots, and Tench explained that he had cut the grass. Schmitt later testified that there was snow on the ground at the time of the interview.

**{¶ 34}** At one point, Weinhardt asked Tench if he had harmed his mother. According to Weinhardt, Tench gave him a long stare and his face turned red. Tench then said in a low monotone voice: "No, I would not harm my mother."

**{¶ 35}** Tench walked the detectives through the house. After this, Tench (who was barefoot) put on the boots and walked with the detectives into the backyard to show them some footprints he had seen in the snow. In the process, he walked over the footprints, obscuring them.

**{¶ 36}** They then went back into the garage. Weinhardt asked Tench if anything was going on in his or his mother's life that might explain her disappearance. Tench looked at the ground for a couple of seconds and then said no. Weinhardt then asked again whether Tench had harmed his mother or had someone do so. Tench gave him another long stare and said, "No, I would not harm my mother."

{¶ 37} While Schmitt and Weinhardt were talking with Tench, the police department called Schmitt to inform him that a silver SUV matching the description of Mary's vehicle had been found at 2811 Carquest Drive. Schmitt and Weinhardt left; Schmitt asked Tench to stay at home, explaining that the detectives had to respond to another call but would be back. Tench asked whether his mother had been found; Schmitt said no. The detectives then went to the location of the SUV.

{¶ 38} Weinhardt saw what appeared to be a body through the SUV's tinted windows. Schmitt broke into the SUV and unlocked it. They were unable to open the tailgate, but Schmitt opened the rear window, revealing Mary's body inside the rear compartment.

{¶ 39} The SUV, with the body inside, was taken to the Cuyahoga County Medical Examiner's office. George Staley, a crime-scene investigator with the Ohio Bureau of Criminal Investigation ("BCI"), arrived after the SUV was towed away; he noted red stains on the ground where it had been. Three stains were tested; each tested positive for blood.

{¶ 40} Police noted a trail of footprints in the snow leading away from the SUV and to the north, in the direction of Park Place at Benjamin Farms, the nearby housing development where the Tenches lived. The footprints veered off toward a retention pond in the field, then resumed their northward course. Mary's purse was found the morning of November 13 under the ice in the retention pond.

{¶ 41} The footprints stopped at 130th Street, which intersects Benjamin Drive; Benjamin leads in turn to Nola Drive, which leads to Greenwich Lane, which leads to Camden Lane. Between 6:15 and 6:30 a.m. on November 12, a person who lives at the corner of Benjamin Drive and 130th Street noticed footprints in front of his house heading in the direction of Nola Drive.

{¶ 42} The detectives returned to Tench's house. An officer watching the house informed them that Tench had left after the detectives did, but had just

returned. The garage door was open, so they stepped inside, drew their guns, and called for Tench. When Tench came out, they placed him in custody.

**{¶ 43}** Tench asked whether they had found his mother. Schmitt informed him that his mother had been found dead nearby in her vehicle and that there were footprints leading back to his house. Tench dropped to one knee and said, "I didn't do anything to my mother."

**{¶ 44}** They went back into the house. Schmitt noticed that the boots were not where they had been, and he asked Tench where they were. Tench said they were up in his bedroom with his dogs, one of which was a pit bull. Nevertheless, Tench gave the officers permission to take the boots. The detectives later collected the boots after summoning an animal-control officer to control the dogs.

**{¶ 45}** Tench was then taken to the Brunswick police station. Photographs taken at the station show that Tench had a large bruise on one forearm and a small scratch on the back of his neck. Tench said he did not know what had caused the bruise but then said it might be from his girlfriend's playfully hitting him. But Kyker later testified that she never struck Tench or bruised his arm.

**{¶ 46}** On November 13, police searched the Tench house. Outside, a BCI agent noted reddish brown stains on the sidewalk, the front porch, the patio furniture on the porch, and the front door. Inside, he found similar stains on a bleach bottle, the kitchen sink, and the washing machine. The agent applied leucocrystal violet to the stains on the bleach bottle, door, and patio furniture; the result of the presumptive test for blood in each case was positive. He collected samples from the walk, the washing machine, and the kitchen sink, and these too tested positive in a presumptive test for blood. A wet sponge found in the kitchen trash also tested positive. Staley cut out a section of the family-room carpet, but it tested negative for blood. No blood was found upstairs.

**{¶ 47}** Police seized a Hewlett-Packard computer from Mary's room and a Dell computer from the basement. They also collected from the basement a garbage

bag containing a discarded wrapper from a roll of Nashua No. 394 duct tape and discarded packaging from a tarpaulin, including a swatch of the tarpaulin material, with the same UPC barcode as the tarpaulin he had bought on November 9.  In the garage, they found a rolled tarpaulin matching the swatch attached to the discarded packaging in the basement.  The tarpaulin was wet on the inside.

{¶ 48} In Tench's bedroom, police found an envelope with the word "Leave" written on it and "Tell police" below that.  On the other side was written "10-24-13 Jimmy owns [sic] $1000.00."  A forensic documents examiner identified the handwriting as Mary's.

{¶ 49} On November 14, police returned to the Tench house to look for financial documents.  In Mary's room, they found copies of the checks Tench had forged in October, which had been printed out from First Merit's website on November 1.  They also found the November 1, 2013 newspaper on which Tench's name was written, along with a list of forged checks.  According to the document examiner, it was "very probable" that this was Mary's handwriting as well.

### C.  The Autopsy

{¶ 50} On November 13, 2013, at the medical examiner's office, Mary's body was removed from the rear of the SUV.  Her body was lying face down.  Mary was wearing a red jacket over her work clothing.  The jacket's fabric had numerous holes, tears, and abrasions.  A loose ring of duct tape hung around her neck like a collar.  This was removed and sent to the FBI for analysis.

{¶ 51} Dr. Cheryl Niblo performed an autopsy, which was observed and supervised by Dr. Erica Armstrong, who testified at trial.

{¶ 52} The autopsy revealed that Mary had sustained at least 18 blows to the head and neck.  Her head injuries included nine lacerations, at least eight bruises, and at least four fractures of the skull.  The blows also caused injuries to her brain.

{¶ 53} Mary's fifth cervical vertebra was fractured, which may have resulted from her head forcefully striking a hard surface. Also fractured were her nose, right collarbone, left upper arm, right shoulder blade, upper and lower jaws, and one finger of her right hand.

{¶ 54} Four of Mary's teeth were broken off. One was found in her intestine. According to Dr. Armstrong, it would have taken 20 to 30 minutes for the tooth to reach that location after being swallowed. Therefore, she concluded that Mary remained alive for at least 20 to 30 minutes after swallowing the tooth.

{¶ 55} Dr. Armstrong also observed a large amount of blood in the back of the SUV after the body was removed. However, she was unable to determine whether Mary was still alive when she was placed in the SUV.

{¶ 56} Dr. Armstrong concluded that the cause of death was multiple blows to the head, neck, trunk, and extremities with a blunt object and that the "major mechanism" of death was bleeding, in addition to brain injuries. Dr. Armstrong could not exclude the possibility that the injuries were caused by Mary's being run over by a car. (However, she conceded that Dr. Niblo did not believe the injuries had been caused that way.)

### D. The Forensic Evidence

{¶ 57} At the BCI laboratory, George Staley examined the SUV. Inside, he noted numerous reddish-brown stains around the driver's seat, including the steering wheel, floorboard, center console, door, and seatbelt. These tested positive in a presumptive test for blood.

{¶ 58} Staley also examined the SUV's exterior, noting damage to the front bumper and front license-plate bracket. He swabbed the front bumper, grille, radiator, and undercarriage. All tested positive in a presumptive test for blood; the swab from the radiator tested positive for human blood. Another BCI analyst later swabbed the front license plate, which had no blood on it, to test for the presence of skin cells. The swabs were later tested for DNA. DNA profiles of the substances

found on the license plate, front bumper, radiator, and undercarriage were consistent with Mary's DNA. The expected frequency of occurrence of the DNA profile found on each item was as follows: 1 in 27.53 trillion for the DNA on the front of the license plate; 1 in 31.3 quadrillion for the DNA on the back of the license plate; 1 in 4.348 quintillion for the DNA on each of the other items.

{¶ 59} Staley collected a red fiber found on the undercarriage of the SUV. Daniel Davison, a forensic scientist in BCI's trace-evidence section, later compared the fiber to the red jacket Mary had been wearing. Davison observed that the fiber had the same color, appearance, and chemical composition as the jacket. He concluded that the fiber could have come from Mary's jacket.

{¶ 60} Staley examined the boots that had been collected from Tench's home. Reddish-brown stains were visible on each boot. Staley tested the stains on the right boot, and they tested positive for blood in a presumptive test. In Staley's opinion, the stains on the boots were spatter stains, which meant that "the boots were present at a spatter-producing event." The stained areas of the right boot were swabbed, and the swab was sent to BCI for DNA analysis. The DNA profile from the stain on the boot was consistent with Mary's DNA. Only 1 in 4.388 quadrillion persons would match the DNA profile of the substance on the boot. (Earth's population is under 8 billion.) Tench was excluded as a possible source of the substance on the boot.

{¶ 61} The substance collected from the sidewalk in front of the Tench house was also tested. It yielded a DNA profile consistent with Mary's. Tench was excluded as a possible source.

{¶ 62} FBI forensic examiner Diana Wright is a chemist specializing in analysis of paint, tape, and polymers. Wright examined the loop of duct tape that had been around Mary's neck in order to identify its manufacturer. After observing and documenting a number of the tape's features, she entered the data into the FBI's

tape-manufacturer database, which she testified is "quite comprehensive of tapes made in North America."

{¶ 63} Wright concluded that the tape from around Mary's neck was "most consistent with" Nashua brand duct tape, made by Berry Plastics, and could be product number 309, 394, or 398. Of the four principal duct-tape manufacturers in the United States, Wright was able to rule out all but Berry Plastics. She could not say where the tape had been sold, but noted that Nashua tape is sold predominantly at Home Depot.

{¶ 64} A United States Secret Service agent specializing in computer forensics examined the hard drive of the Dell computer seized from the basement of the Tench house. He testified that someone using that computer had typed the phrase "kill someone without getting caught" into the Google search engine, although he could not determine when this was done. The last shutdown date on the computer was April 11, 2013.

{¶ 65} The agent also examined the hard drive of the Hewlett-Packard computer found in Mary's room. He found temporary files cached in the operating system that contained images from Google Maps. The images include the general area where Mary's body was found. Most of these images were accessed shortly after 2:00 p.m. on November 11, 2013; a few were accessed at 8:57 a.m., November 12, 2013.

### E. The FBI's Cell-Phone Analysis

{¶ 66} FBI Agent Kunkle testified that cell-phone records show which cell towers, and which side of a particular tower, a given cell phone used when it made or received a call. With this information, an expert can determine the general area a given phone was in at particular times.

{¶ 67} Kunkle conducted a study of cell-phone records pertaining to Mary's Verizon phone and to Tench's Sprint phone. Kunkle's analysis indicated that Mary's phone was in Lakewood (where she worked) at 11:15 p.m., when Tench

called her. By 11:51, when Mary's phone was used to call Tench's phone, her phone had moved to Brunswick and was in a location "consistent with 758 Camden Lane," i.e., her house. Between 1:22 and 1:59 a.m., when Tench was calling and texting Kyker, his phone was using the south side of a cell tower (designated by Kunkle as Tower 1) located west of the Tench house. Therefore, the phone was located in a sector including both the Tench house and the Carquest Drive area. Tench's phone was still in that sector from 2:03 to 2:04 a.m., when it called Mary's phone, which was still in the vicinity of her house.

{¶ 68} However, soon thereafter both phones moved in a northerly direction. At 2:05, Tench's phone began to use a different tower (designated by Kunkle as Tower 2), located northwest of the one it had been using (Tower 1). Tench's cell-phone signals initially were hitting the southern side of Tower 2, then shifted to the northwest side of that tower, indicating movement to the north. However, at 2:23 a.m., Tench's phone went back to using Tower 1. At 2:39 a.m., calls to Mary's phone began hitting cell towers in North Royalton, which is northeast of Brunswick, indicating that since 2:04 a.m., her phone had moved from its previous location into the area covered by those towers.

### F. Indictment, Trial, and Sentence

{¶ 69} Tench was indicted on three counts of aggravated murder: one charging murder with prior calculation and design, R.C. 2903.01(A), one charging felony murder, R.C. 2903.01(B), predicated on aggravated robbery, and one charging felony murder predicated on kidnapping. Each count carried three death specifications: felony murder, R.C. 2929.04(A)(7), predicated on aggravated robbery, felony murder predicated on kidnapping, and witness murder, R.C. 2929.04(A)(8).

{¶ 70} The indictment included five noncapital counts: murder, R.C. 2903.02(A), murder, R.C. 2903.02(B), aggravated robbery, R.C. 2911.01(A)(3),

kidnapping, R.C. 2905.01(A)(2),[1] and tampering with evidence, R.C. 2921.12(A)(1).

{¶ 71} The jury found Tench guilty of all counts and all specifications submitted to it.[2] Because all three aggravated-murder counts applied to the same victim, only Count One (prior calculation and design), with its three aggravating circumstances, was submitted to the jury for sentencing. After a mitigation hearing, the jury recommended a death sentence on Count One. The trial judge sentenced him to death.

{¶ 72} Tench appeals as of right. He sets forth 18 propositions of law, which we address out of order for clarity of analysis.

## II. Suppression Issues

{¶ 73} At trial, Tench filed a motion to suppress the oral statements he had made to the police. The trial court denied the motion. In his first proposition of law, Tench contends the trial court erred by not suppressing (1) his statements to Brunswick detectives on November 12, 2013, and (2) his statements to Detective Borowske of Strongsville on November 13, 2013.

### A. Fifth Amendment Right to Counsel

{¶ 74} Tench contends that all the statements he made to the Brunswick detectives while in custody on November 12 should have been suppressed, because his Fifth Amendment right to counsel during custodial interrogation, *see Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was violated when Brunswick police interrogated him after he had invoked his right to counsel.

{¶ 75} If a suspect in custody requests counsel, "interrogation must cease until an attorney is present." *Id.* Moreover,

---

[1] Because of an error in the kidnapping count, the grand jury returned a new indictment alleging one count of kidnapping; this was substituted at trial for the kidnapping count in the original indictment.
[2] Both the aggravated-robbery and kidnapping counts included a repeat-violent-offender specification, R.C. 2941.149. These were tried to the bench.

when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. * * * [A]n accused, * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

(Footnote omitted.) *Edwards v. Arizona*, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.E.2d 378 (1981).

**{¶ 76}** However, "the suspect must *unambiguously* request counsel." (Emphasis added.) *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id*. at 461-462. The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*. at 459. Moreover, if the suspect does request counsel, police may still interrogate him if—but only if—he initiates a conversation. *Edwards* at 485. We now apply the above principles to the conversations between Tench and Brunswick police on November 12, 2013

**1. November 12, 2013: Tench Is Taken into Custody**

**{¶ 77}** On November 12, 2013, Detectives Weinhardt and Schmitt spoke with Tench at his home. The trial court found, and Tench concedes, that this interview was noncustodial. This interview ended when the detectives were summoned to the field where the SUV was found.

{¶ 78} After Mary's body was found inside the SUV, Weinhardt and Schmitt returned to Tench's home, which was being watched by a uniformed patrol officer, Scott Stewart. The detectives called Tench out of the house and drew their guns. When Tench came out, they told him to put his hands over his head. When he complied, they patted him down.

{¶ 79} Tench asked the detectives if they had found his mother, and Schmitt informed him that she had been found dead. Weinhardt asked Tench if he was responsible for his mother's death or whether he knew who was. He said no to both questions. The patrol officer handcuffed Tench, and Weinhardt administered *Miranda* warnings. Tench acknowledged that he understood his rights.

### 2. Tench Invokes His Right to Counsel

{¶ 80} The detectives then asked whether Tench was willing to go inside the house and speak with them. He agreed. The detectives asked several times whether he had had anything to do with his mother's death. Finally, Tench said: "I know what you guys are trying to do. I think I want an attorney." The detectives then ceased asking questions and had Stewart take him to the Brunswick police station.

### 3. Stewart's Conversation with Tench

{¶ 81} On arriving at the station, without being questioned, Tench talked to Stewart about his job with Old Carolina Barbecue, mentioning that he was now with the Akron restaurant rather than the Strongsville one. After reminding Tench of the *Miranda* warnings given earlier, Stewart asked Tench if he could ask a question. Tench agreed that he could. Stewart asked Tench if his mother had had any problems with any male friends or others who might have caused her harm. Tench said he was not aware of anybody.

{¶ 82} Tench argues that when he said to the detectives, "I think I want an attorney," he made an "unequivocal request for an attorney" and that thereafter, the police should have stopped all questioning. If Tench's statement "I think I want an

attorney" is regarded as an unambiguous invocation of the right to counsel, Tench argues, then Stewart violated that right by asking Tench to identify anyone who might have harmed his mother.

{¶ 83} The trial court determined that Tench's statement was not a clear invocation of his right to counsel. We note that several courts have characterized less definite statements as unequivocal requests for counsel, even when prefaced by "I think." *See, e.g., Alford v. State*, 699 N.E.2d 247, 250 (Ind.1998) ("I think it would be in my best interest to talk to an attorney" was understood by police to be a request for counsel); *State v. Munson*, 594 N.W.2d 128, 139-140 (Minn.1999) ("I think I'd rather talk to a lawyer" was clearly treated by police officers as a request for counsel). Schmitt and Weinhardt also construed Tench's statement as a request for counsel and terminated direct questioning of Tench at that point. *See Munson*, 594 N.W.2d at 139; *compare Clark v. Murphy*, 331 F.3d 1062, 1069-1071 (9th Cir.2003), *overruled in part on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (state court's conclusion that "I think I would like to talk to a lawyer" was ambiguous was neither contrary to, nor an unreasonable application of, clearly established law); *Diaz v. Senkowski*, 76 F.3d 61, 63-65 (2d Cir.1996) ("I think I want a lawyer" followed by "Do you think I need a lawyer?" was ambiguous); *Ex parte Cothren*, 705 So.2d 861, 866-867 (Ala.1997) ("I think I want to talk to an attorney before I answer that" was not absolute).

{¶ 84} However, Tench's response to Stewart's question was not introduced against him at trial. And Tench does not argue that his later statements to Weinhardt should have been suppressed as fruits of an *Edwards* violation by

Stewart.[3]  Thus, we need not determine whether Stewart committed an *Edwards* violation.

### 4.  Weinhardt's First Interrogation of Tench on November 12

**{¶ 85}** After placing Tench in a holding cell, Stewart told Weinhardt that Tench had initiated a conversation, had been reminded of the *Miranda* warnings, and had answered Stewart's question.  Stewart told Weinhardt that he believed Tench wanted to speak further with the detective.  Tench was then taken to an interview room.

**{¶ 86}** As Weinhardt and Tench entered the room, Tench immediately asked: "Do you have my phone on you?"  Weinhardt said he did not.  Tench said: "I need a number out of there * * * to call my attorney."  Weinhardt said, "And who did you say that person was?"  Tench responded, "My cousin Sarah.  She's an attorney."

**{¶ 87}** Weinhardt did not respond immediately.  Instead, he read Tench the *Miranda* warnings from a form.  Weinhardt added: "Don't sign down here [the waiver of rights at the bottom of the form] if you don't want to talk to me, but if I can just have you fill out this top portion here.  Just says you understand what I read to you."  Tench did not sign the bottom portion of the form but did sign the top portion, indicating that he understood his rights.

**{¶ 88}** Weinhardt then said:

> Okay.  Now, the thing is, this is your cousin that's the attorney?  I want to get you that phone call, but I also want to make notification to your other family members of your mother's death. * * * As soon as you make that phone call, that notification is going

---

[3] Courts differ as to whether the "fruit of the poisonous tree" doctrine applies to *Edwards* violations. *Compare Howard v. Moore*, 131 F.3d 399, 413-415 (4th Cir.1997) (doctrine does not apply) *with Osburn v. State*, 326 S.W.3d 771, 782-784 (Ark.2009) (applying doctrine).

> out. * * * We want to do this in person. We have to go and talk to your sister in person, because I talked to her earlier. She was very concerned. It was, you know * * * "Mom was supposed to be there this morning," so I just want to make sure that's done correctly. It's going to * * * have to be done in person with police officers at the house.

Tench said: "I want to be the one that tells my sister * * *." Weinhardt told him he could not; when Tench asked why, the detective replied: "Because you're in here right now, and I'm not going to allow that to happen."

{¶ 89} Tench then said: "I didn't do anything." Weinhardt said, "Okay." Tench added: "Do you really think if I did it I would be okay with my family shelling out money for a private investigator?" An interview followed during which Tench repeatedly denied killing his mother.

{¶ 90} We need not determine whether Tench's statement "I think I want an attorney" was an unambiguous invocation of the right to counsel in order to determine the admissibility of Weinhardt's interrogation of Tench. Even if the statement was not an unambiguous invocation of the right to counsel, Tench made another request. When Weinhardt and Tench entered the interview room, Tench immediately asked about the whereabouts of his phone because he "need[ed] a number out of there * * * *to call [his] attorney*." (Emphasis added.) We cannot see this as anything other than an expression of Tench's desire to contact his lawyer. It is an unambiguous invocation of the right to counsel.

{¶ 91} Given Tench's invocation of his right to counsel, he could not be subjected to further uncounseled custodial interrogation unless he "initiate[d] further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485, 101 S.Ct. 1880, 68 L.Ed.2d 378. Hence, the question before us is this: Who initiated discussion of Tench's case, Tench or the police?

**{¶ 92}** Tench's request for his cell phone clearly does not constitute an initiation on his part:

> [S]ome inquiries, such as * * * *a request to use a telephone* * * * are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, *by either an accused or a police officer*, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in *Edwards*.

(Emphasis added.) *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion); *see also Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir.2015) (after invocation of counsel, police were free to converse with suspect about routine incidents of the custodial relationship); *Berry v. Warden, Southern Ohio Correctional Facility*, 872 F.3d 329, 333 (6th Cir.2017).

**{¶ 93}** After Tench asked for his phone, Weinhardt readministered the *Miranda* warnings to him. But reading *Miranda* warnings to a suspect, even after he has invoked his right to counsel, is not interrogation and thus does not violate *Edwards*, at least where police "ma[k]e no effort to question [the suspect] or secure a waiver of [his] rights." *United States v. Morgan*, 738 F.3d 1002, 1005 (9th Cir.2013).

**{¶ 94}** After rereading the *Miranda* warnings, Weinhardt responded to Tench's request for his cell phone. Just as Tench's request did not initiate a generalized conversation about the investigation, neither did Weinhardt's response to this request initiate such a conversation. Weinhardt did not try to open up a

"generalized discussion relating directly or indirectly to the investigation." *Bradshaw* at 1045.

**{¶ 95}** Weinhardt indicated his intention to comply with Tench's request ("I want to get you that phone call") and then explained why this could not be done at that time (because Weinhardt wished to notify Tench's sister in person before Tench called any other relatives). When Tench said he wanted to be the one to tell his sister, Weinhardt explained that he would not allow this. This entire exchange stemmed from the fact that Tench was in custody, unable to make phone calls until given access to a telephone. It thus involved a "routine incident of the custodial relationship," *id.*, and did not initiate a general discussion of the case or the investigation.

**{¶ 96}** Weinhardt's later statements also related to the custodial relationship. When he told Tench that his sister was concerned because their mother had not been where she was supposed to be that morning, he was explaining why the police needed to notify her in person. This statement flowed from the discussion of who was going to tell Tench's sister about her mother's death—a discussion made necessary by the custodial relationship—and does not represent an attempt by Weinhardt to strike up a discussion relating to the investigation. Thus, we conclude that during this discussion, neither Weinhardt nor Tench " 'initiate[d]' a conversation in the sense in which that word was used in *Edwards*." *Bradshaw*, 462 U.S. at 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405.

**{¶ 97}** Tench's next words, "I didn't do anything," did initiate such a conversation. This conclusion is reinforced by what Tench said next: after Weinhardt's noncommittal response, Tench said, "Do you really think that if I did it, I would be okay with my family shelling out money for a private investigator?" Thus, we conclude that it was Tench who initiated discussion of the case.

### 5. Tench Again Invokes His Right to Counsel

{¶ 98} Later during the same interview, Tench asked, "Can I call my cousin?" Weinhardt again explained that he wanted to notify Tench's family first, explaining "[O]nce your cousin knows, your family's going to know." There was further discussion of who was going to notify Tench's family, with Tench asking Weinhardt to let him do it and Weinhardt refusing. Then Weinhardt asked Tench if he could take a DNA mouth swab, and Tench agreed.

{¶ 99} Questions like "Can I have an attorney?" are often not treated as clear invocations of the right to counsel. *See generally State v. Raber*, 189 Ohio App.3d 396, 2010-Ohio-4066, 938 N.E.2d 1060, ¶ 19-20 (9th Dist.) (citing cases). However, in the context of Tench's previous unequivocal requests for his attorney, we think that his request to call his cousin, whom he had identified as his attorney,[4] must be considered a clear invocation of the right. Given that, we must again determine whether Weinhardt or Tench initiated discussion of the case after Tench invoked his right to counsel.

{¶ 100} We first consider whether Weinhardt's request for consent to take a DNA swab constituted "police-initiated custodial interrogation," *Edwards*, 451 U.S at 484, 101 S.Ct. 1880, 68 L.Ed.2d 378. We conclude that it did not. "[U]sing a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search." *Maryland v. King*, 569 U.S. 435, 446, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013). By making this request, Weinhardt was asking Tench to consent to a search. But "a request to search does not amount to interrogation." *United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir.1993). Thus, even if a suspect in custody has invoked his right to counsel, police do not violate *Edwards* by asking him to

---

[4] In our discussion of Tench's fourth proposition of law, we conclude that no attorney-client relationship was shown to exist between Tench and his cousin. But the lack of an actual attorney-client relationship is not relevant in this analysis. What matters is that Tench unequivocally "expressed his desire to deal with the police only through counsel." *Edwards*, 451 U.S. at 484, 101 S.Ct. 1880, 68 L.E.2d 378.

consent to a search. *United States v. Shlater*, 85 F.3d 1251, 1255-1256 (7th Cir.1996).

{¶ 101} After that request, Tench asked again: "Listen, can I just call my cousin, please?" Weinhardt assured him that he would be allowed to call her very soon but he wanted to be sure Tench's family was notified about Mary's death first. Tench also asked to call his girlfriend, asserting that he was supposed to meet her at 7:00, and Weinhardt said, "I'm going to let you make those phone calls, yes."

{¶ 102} Tench then began talking about his girlfriend and how "she was going to * * * help [him] figure this out." That led him to talk about his mother's death: "All I've been doing all day is thinking, 'What the hell happened? That's not like her not to show up. I'm not going to let my dad down.' "

{¶ 103} Again, Tench invoked the right to counsel by asking to call his cousin. Again, therefore, we must determine who initiated discussion of the case after this invocation.

{¶ 104} As we explain above, the discussion of who was going to notify Tench's family about the murder was "relat[ed] to routine incidents of the custodial relationship" and thus in that discussion, Tench did not " 'initiate' a conversation in the sense in which that word was used in *Edwards*." *Bradshaw*, 462 U.S. at 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405. We think that conclusion also applies to the discussion whether Tench could call his girlfriend. *See Collins v. State*, 172 So.3d 724, 737 (Miss.2015) (suspect's query about "how long things would take," because he needed to call his employer if he was going to miss work, related to routine incident of custodial relationship and did not initiate conversation as contemplated by *Edwards*).

{¶ 105} But after that discussion, and without prompting on the part of Weinhardt, Tench began to talk about his mother's death. Her death, of course, was the subject of the investigation. Thus, we conclude that it was again Tench who initiated conversation about the case.

**{¶ 106}** To sum up, although Tench invoked his right to counsel at various times before and during the first interrogation, we conclude that after each invocation, he was the one who initiated discussion about the case. Weinhardt did not initiate such discussion when he administered *Miranda* warnings, explained why Tench could not call his sister or cousin, or asked Tench to let him take a buccal swab.

### 6. Waiver

**{¶ 107}** Since Tench initiated the conversation, our next inquiry must be "whether a valid waiver of the right to counsel and the right to silence * * * occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Edwards*, 451 U.S. at 486, 101 S.Ct. 1880, 68 L.Ed.2d 378, fn. 9.

**{¶ 108}** Tench contends that he did not validly waive his rights because he did not sign the waiver portion of the *Miranda* form or otherwise make an express waiver. We disagree. It is well established that waivers of *Miranda* rights—including the right to the presence of a lawyer during custodial interrogation—need not be expressly made to be valid. *North Carolina v. Butler*, 441 U.S. 369, 374-376, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.2d 857, ¶ 101. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, 560 U.S. 370, 385, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).

**{¶ 109}** In this case, Tench was properly advised of his rights. He does not contend that he did not understand them, and the record establishes that he did. Nothing in the record suggests that the police made any threats or offered any promises or inducements to Tench to talk to them without counsel present. And

26

Tench initiated the conversation about the case. On this record, the state carried its burden of showing that Tench's waiver was valid and his statements voluntary. *See generally Bradshaw*, 462 U.S. at 1046, 103 S.Ct. 2830, 77 L.Ed.2d 405. We therefore hold that the trial court did not err by declining to suppress Tench's statements from the first November 12 interaction with police.

### 7. Weinhardt's Second Interrogation of Tench on November 12

**{¶ 110}** About six minutes after the first interrogation concluded, Tench, who had been returned to his cell, motioned to Weinhardt and said he wanted to talk to him. Weinhardt opened the cell and said: "[Y]ou understand that I did not ask you to talk. You're asking me to talk." Tench replied, "Okay." Weinhardt took him back to the interview room, and they had another video-recorded conversation.

**{¶ 111}** At the outset of this interview, Weinhardt said, "I just want to make it quite clear, because obviously you know this is being taped, that I did not ask you any questions. I'm letting you— You said you wanted your attorney present. You flagged me down when I put you back in the cell. You wanted to talk to me about something?" Tench said, "Yeah." He then proceeded to talk about the tracks in the snow at his house, and he and Weinhardt discussed the case. At the end of the discussion, Weinhardt said: "You came in here of your own free will and talked to me." Tench said: "Exactly."

**{¶ 112}** Plainly Tench initiated this conversation. There was no violation of the rule presented in *Edwards*. And the record again shows that his waiver was valid and his statements voluntary. We hold that the trial court did not err by declining to suppress Tench's statements from the second November 12 interview.

### B. Sixth Amendment Right to Counsel

**{¶ 113}** On November 13, 2013, Detective Steve Borowske of the Strongsville police arrested Tench at the Brunswick police station, took him to the Strongsville police station, and interviewed him about the Old Carolina Barbecue

robbery, which Borowske was investigating. Before the interview, Borowske administered *Miranda* warnings and obtained Tench's signature on a form indicating that he understood his rights. He then asked Tench whether he was willing to talk. Tench replied that he wanted to know the questions. He added, "I was speaking to an attorney in Brunswick when I found out that you guys were coming to arrest me." He concluded: "I guess I'll decide to answer when you ask, I guess." During this interview, Tench denied having anything to do with the Old Carolina Barbecue robbery. At trial, Borowske testified to various statements Tench made in the November 13 interview.

{¶ 114} Tench contends that when he advised Borowske that he had been "speaking to an attorney," Borowske should have immediately ceased questioning him. While Tench does not fully articulate his argument, he appears to be claiming that his Sixth Amendment right to counsel in this case was violated because Borowske interrogated him while he was represented by counsel and after he was criminally charged. Tench makes no claim here that he did not validly waive his Fifth Amendment rights in the Strongsville interview.

{¶ 115} The Sixth Amendment right to counsel is offense specific, and it does not attach until the initiation of adversarial judicial criminal proceedings—a formal charge, a preliminary hearing, an indictment or information, or an arraignment—with respect to a particular offense. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). When Borowske interrogated Tench on November 13, 2013, Tench's Sixth Amendment right to counsel had not attached with respect to the crimes charged in the instant case. Tench was not indicted in this case until August 14, 2014, and there were no adversarial judicial proceedings concerning these charges until August 28, 2014.

{¶ 116} Because neither Tench's Fifth Amendment claim nor his Sixth Amendment claim has merit, we overrule Tench's first proposition of law.

### III. Jury Issues

### A. Inadequate Voir Dire

{¶ 117} In his second proposition of law, Tench contends that his trial counsel were ineffective in that they "failed to attempt to rehabilitate" two prospective jurors who were ultimately excused for cause by reason of their views on capital punishment: prospective juror Nos. 98 and 182. (Tench claims that counsel failed to question these prospective jurors "in any way," but as we will see, this assertion is false.)

{¶ 118} To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### 1. Prospective Juror No. 98

{¶ 119} Prospective juror No. 98 wrote on her questionnaire, "I am against [the] death penalty" and "I don't want to be a part of condem[n]ing a person to death." Her circled responses to multiple-choice questions indicated that she had never felt differently about capital punishment, opposed it "under all circumstances," and "could never, under any circumstances, return a verdict which called for death."

{¶ 120} On voir dire, prospective juror No. 98 gave responses wholly consistent with those on her questionnaire. She said: "I couldn't do that [vote to impose death]. I wrote that on my sheet. I am totally against it so I couldn't." Although the prosecutor and trial judge explained the law to her, she adhered to this stand. When the judge asked whether she was stating "unequivocally and without doubt" that she would "under no circumstances" follow the court's instructions and consider voting to impose death, she replied: "I will not."

{¶ 121} Defense counsel asked: "[I]'m probably wasting my time, but could you if you listened to everything still be at least open to consider the death penalty?" Prospective juror No. 98 replied: "No, I can't * * *[.]  I do not feel comfortable with it and I feel like that would be haunting me."

{¶ 122} Finally, the trial court asked prospective juror No. 98 if she would automatically vote against imposing death regardless of the evidence.  She said yes.  The trial court granted the state's challenge for cause.

{¶ 123} It is true that defense counsel made little effort to rehabilitate prospective juror No. 98.  But counsel did not simply stand mute, contrary to what Tench implies.  In any event, we have consistently refused to second-guess trial counsel's decision not to rehabilitate death-scrupled prospective jurors on voir dire.  Trial counsel, who "could see and hear the jurors answer questions * * * were in a much better position to determine if the jurors could be 'rehabilitated' than is this court."  *State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989); *accord State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995); *State v. Lindsey*, 87 Ohio St.3d 479, 489, 721 N.E.2d 995 (2000).

{¶ 124} It is not deficient performance for trial counsel to decline to ask follow-up questions of a prospective juror who has expressed intractable views against the death penalty.  *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 229; *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 200; *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 222.  And this prospective juror's questionnaire and voir dire show that her refusal to consider the death penalty was intractable.

## 2. Prospective Juror No. 182

{¶ 125} Prospective juror No. 182 was less adamant in opposing the death penalty, expressing instead contradictory views on the subject.  He started by saying he did not know if he could sign a death verdict.  He then said God is the "final authority" on taking a life and he (the prospective juror) should not make such a

decision. He did not think he could put this view aside. But then he said he "would have to" consider the death sentence if so instructed. The prospective juror stood by this position for several questions.

{¶ 126} But then the prosecutor asked whether there was anything the court should know concerning his ability to be fair. Prospective juror No. 182 replied that he did not know whether he would be "swayed" by his religious views. He then took back his previous willingness to consider a death sentence: "I probably couldn't put someone down for the death penalty," regardless of the evidence. The trial judge asked prospective juror No. 182 if he meant he could not follow the court's instructions and fairly consider the death penalty. He replied, "No, I probably couldn't." The state challenged the prospective juror for cause.

{¶ 127} Defense counsel inquired briefly. Counsel explained the bifurcated proceeding, established that prospective juror No. 182 was "open to [considering] mitigating factors," and explained that a juror could consider anything he regarded as mitigating. Counsel then asked, "[I]f the aggravating factors were greater than the mitigating and the law says you have to sign the verdict, can you do that?" The prospective juror replied, "For the death penalty? * * * Didn't I just answer that?" When counsel repeated the question, he said: "No, I couldn't sign." The trial court then excused prospective juror No. 182 for cause.

{¶ 128} Contrary to Tench's assertion, defense counsel made a reasonable attempt to rehabilitate prospective juror No. 182. The attempt was simply unsuccessful. Tench does not argue that better questioning would have elicited better responses; such an argument would be speculative. *See Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, at ¶ 61, 68, 70 (rejecting speculative assertions that different questions would have exposed unexpressed juror bias).

{¶ 129} Tench fails to show either deficient performance or prejudice and hence fails to make out an ineffective-assistance claim with respect to either prospective juror. We overrule his second proposition of law.

## B. Excusal for Cause

**{¶ 130}** In his third proposition of law, Tench contends that prospective juror No. 298 was improperly excused for cause due to his views on capital punishment. "A prospective juror may be excluded for cause if the juror's views on capital punishment 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *State v. Myers*, __ Ohio St.3d __, 2018-Ohio-1903, ___ N.E.3d ___, ¶ 107, quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

**{¶ 131}** Initially, prospective juror No. 298 said on voir dire that he would engage in the weighing process "[a] little bit." While he said he believed he could sign a death verdict, he was not sure.

**{¶ 132}** But prospective juror No. 298 had given conflicting answers on his questionnaire. On one multiple-choice question, he indicated that he was "opposed to the death penalty under all circumstances" in aggravated-murder cases. On a later one, he indicated that "the death penalty should be imposed in all capital murder cases." The prosecutor called his attention to the conflict and asked the prospective juror whether he felt "the death penalty is * * * okay but you can't be the one who imposes it." The prospective juror agreed with that statement. Next, he agreed that no matter what the instructions were, he could not sign a death verdict. The prosecutor then challenged prospective juror No. 298 for cause. The trial court asked the prospective juror if he would follow the instructions and fairly consider the imposition of death, and the prospective juror said he would do so.

**{¶ 133}** Continuing voir dire, the prosecutor encouraged the prospective juror to "speak from the heart." He replied that he "couldn't make the decision on whether to give the death penalty or not." He told the prosecutor and the trial court that he did not think he could follow the instructions and fairly consider voting to impose death.

**{¶ 134}** In response to defense questioning, the prospective juror said he did not know if he could be fair. Defense counsel outlined the range of sentencing options, but the prospective juror said he did not find this information helpful.

**{¶ 135}** Finally, the trial court said, "I think [the prospective juror] has clearly articulated that under no circumstances, even with the Judge's instructions, would he consider the death penalty even if so instructed. Is that correct, [prospective juror]?" The prospective juror answered yes. The trial court excused the prospective juror over defense objection.

**{¶ 136}** Tench contends that prospective juror No. 298 was not excludable, because he "made it clear that he would follow the law as given by the [trial court]." The record does not support this assertion. The prospective juror indicated twice that he could consider the death penalty, but he displayed uncertainty the first time he said it. And he stated once that he would follow the trial court's instructions. But he also said he did not know whether he could be fair. And he repeatedly said he did not think he could ever vote for the death penalty, regardless of instructions.

**{¶ 137}** A trial court's ruling on a challenge for cause will not be overturned on appeal if the record supports the ruling. *Myers*, ___ Ohio St.3d ___, 2018-Ohio-1903, ___ N.E.3d ___, at ¶ 107, citing *State v. Wilson*, 29 Ohio St.2d 203, 211, 280 N.E.2d 915 (1972). Here, the trial judge found that under no circumstances would this prospective juror consider the death penalty. This finding is supported by the prospective juror's questionnaire response and his repeated statements on voir dire. His contradictory statements "created a fact question for the trial court to resolve." *Myers* at ¶ 110, citing *State v. Jones*, 91 Ohio St.3d 335, 339, 744 N.E.2d 1163 (2001). The trial court did not abuse its discretion in resolving it here. Accordingly, we overrule Tench's third proposition of law.

## IV. Evidence Issues

## A. Other-Acts Evidence

**{¶ 138}** In his fifth proposition of law, Tench contends that the trial court erroneously admitted numerous items of "other acts" evidence against him, in violation of Evid.R. 404(A)(1) and (B). Tench's principal claim is that the trial court improperly admitted evidence that he committed the armed robbery of the Old Carolina Barbecue restaurant in Strongsville on October 28, 2013. This claim is meritorious. So are many of the other claims he makes in this proposition. However, because overwhelming evidence proves Tench's guilt, the trial court's errors were ultimately harmless.

**{¶ 139}** Evid.R. 404(A)(1) is a general prohibition on using evidence of a person's character to prove that he acted "in conformity therewith on a particular occasion." Evid.R. 404(B) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20, we set forth a three-step analysis for a trial court to conduct in determining the admissibility of other-acts evidence. The court must consider (1) whether the other-acts evidence is relevant under Evid.R. 401, i.e., whether it tends to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence, (2) whether the evidence is presented to prove a person's character to show conduct in conformity therewith, or whether it is presented for a legitimate other purpose, (3) whether the probative

value of the evidence is substantially outweighed by the danger of unfair prejudice, Evid.R. 403. However, "the rule affords broad discretion to the trial judge regarding the admission of other acts evidence." *Id.* at ¶ 17.

{¶ 140} Tench complains that several categories of other-acts evidence were introduced against him: evidence concerning the Old Carolina Barbecue robbery, evidence that he maltreated and expressed hostility toward his mother, evidence that someone deleted a text message from the cell phone of his girlfriend and deleted information from her Facebook account, evidence that his supervisor suspected him of embezzlement, evidence that he possessed illegal drugs, evidence that photocopies of another person's state-issued identification card and Social Security card were found in his truck, and evidence that he had Googled the phrase "kill someone without getting caught."[5] We begin with the most serious of the alleged errors: the Old Carolina Barbecue robbery.

### 1. The Old Carolina Barbecue Robbery

{¶ 141} Before trial, the state gave notice that it intended to use other-acts evidence, including the Old Carolina Barbecue robbery, against Tench. *See* Evid.R. 404(B) (proponent of other-acts evidence must provide reasonable notice). The trial court ruled that evidence involving the Old Carolina Barbecue robbery was admissible. At trial, the defense renewed its objection to admission of the robbery evidence. The defense further objected to proof of the details of the robbery, and specifically the fact that it also involved a kidnapping.

{¶ 142} At trial, the state called Strongsville police detective Steve Borowske, who investigated the Old Carolina Barbecue robbery. His testimony was the principal means by which the robbery was made known to the jury. During his investigation, Borowske learned that a person wearing a skull mask and hooded

---

[5] Tench also contends that the trial court erroneously admitted evidence about his "opening credit cards in his father's name, problems between Tench and his supervisors," and "evidence of other people's tax returns [being found] in his room." But his brief offers no discussion or analysis of these matters beyond the mere cursory mention of them, giving us no reason to find error.

sweatshirt had robbed the restaurant at gunpoint. Two employees ran and hid; two others were forced into a walk-in cooler by the robber. Borowske testified that the victims were "scared to death" by the incident. He testified that the restaurant's exterior security cameras captured Tench in the parking lot at the time of the robbery. After reviewing the tape with Borowske, an Old Carolina Barbecue manager told him that the suspect looked exactly like Tench.

{¶ 143} On November 13, 2013, Borowske testified, he participated in the execution of a search warrant at the Tench house and in Tench's bedroom, he found a black hooded sweatshirt resembling the one worn by the robber. Later that day, and again on November 15, he interrogated Tench at the Strongsville police station. Tench admitted that he was in the parking lot at the time of the robbery, but denied having committed the robbery.

{¶ 144} In March 2014, Borowske testified, he spoke to Tench again. By then, Tench had been convicted of and sentenced for the robbery. This time, Tench admitted his guilt. He said he had done it because he needed money to put into his mother's checking account, because she was forgetful and was overdrawing her account. He told Borowske that he had used a toy gun that he had spray-painted black. Borowske testified that police never found the gun used in the robbery.

{¶ 145} The state also raised the subject of the robbery during testimony by other witnesses. Christina Kyker testified that Tench mentioned the robbery to her the day after it happened. With an air of amusement, he said the robbers had picked a day when the restaurant had not been busy and as a result, had gotten only $300. He did not tell her he was the one who had done it.

{¶ 146} Jonathan Casey testified that Tench called him the night of the robbery and asked whether he had heard that the restaurant had been robbed. In a later conversation, Tench asked Casey whether Casey thought he (Tench) had had anything to do with it. Casey testified that Tench also said, " 'Imagine them getting robbed by a girl.' " (According to Casey, the perpetrator had worn a wig.)

**{¶ 147}** Finally, Detective Weinhardt testified that he learned about Mary's disappearance on the morning of November 12. At that time, another officer informed him that Tench was a person of interest in a recent Strongsville robbery. Weinhardt testified that this information had had an effect on his thinking in the case of Mary's disappearance. And Detective Schmitt testified that at the time he learned of Mary's disappearance, he knew Strongsville police suspected Tench of the Old Carolina Barbecue robbery and this heightened his awareness of the possible seriousness of the situation.

**{¶ 148}** Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**{¶ 149}** The existence of a motive for Tench to kill his mother is certainly a "fact of consequence to the determination of the action." Thus, the question is: Does evidence that Tench robbed the Old Carolina Barbecue on October 28 have a tendency to make the existence of a motive "more probable * * * than it would be without the evidence"? This question has a clear answer: The Old Carolina Barbecue robbery has no tendency whatever to show that Tench had a motive to kill his mother.

**{¶ 150}** The state argued in the pretrial proceedings and argues before us that the Old Carolina Barbecue robbery is probative of Tench's motive to kill. The state contends that Tench's use of the robbery's proceeds to replace funds he had stolen from his mother's bank account proves he wanted to conceal his thefts from his mother.

**{¶ 151}** At trial, however, the state asserted that Tench killed his mother because he believed she intended to complain to the police about his stealing from her. If that was his motive, he must have formed it *after* he realized his mother knew he was stealing from her, because she could hardly complain about thefts she

was unaware of. Yet the state contends that Tench committed the Old Carolina Barbecue robbery to *prevent* his mother from finding out about his thefts from her. In other words, the robbery took place *before* Tench knew that his mother had discovered his thefts. There is no connection between Tench's desire to conceal the thefts from his mother and his asserted motive to kill his mother.

{¶ 152} At trial, the state offered a second "motive" argument. When the defense objected to showing the details of the robbery, especially the fact that restaurant employees had been forced into the cooler, the state claimed it needed to show that the robbery involved a kidnapping, because that fact strengthened Tench's motive for murder.

{¶ 153} The state argued that Tench knew he was facing "a ton of prison time" if convicted of robbery and kidnapping. The state theorized that Tench believed that the police would focus on him in their investigation of the robbery if his mother reported his thefts to the police. On this theory, Tench's desire to avoid punishment for the Old Carolina Barbecue robbery and kidnapping was part of his reason for killing his mother—and the more serious the penalty he faced, the stronger his motive to kill.

{¶ 154} In terms of relevance, this theory fares no better than the first. It rests on a chain of speculation about Tench's thought processes that is not supported by any evidence in this case. There is nothing in the record to suggest that Tench believed an investigation of the thefts from his mother would make it more likely that police would connect him to the robbery.

{¶ 155} Finally, the state argues in its brief that the robbery evidence was relevant because Tench's being suspected of the robbery was "essential to understanding the detectives' * * * early focus on Tench as a suspect" in his mother's disappearance. Detectives Weinhardt and Schmitt knew Tench was suspected of the robbery, and this knowledge affected Weinhardt's thinking in the

case of Mary's disappearance and heightened Schmitt's awareness of the possible seriousness of her disappearance.

{¶ 156} Explaining police actions can be a valid basis for introducing other-acts evidence. *See State v. Crawley*, 633 N.W.2d 802, 806 (Iowa 2001). And in this case, the prosecution had reason to explain why the detectives focused on Tench. Defense counsel had said in opening statement that "it was easy for the * * * police to focus on" Tench and counsel accused the police of having had "tunnel vision."

{¶ 157} But if the robbery was introduced to explain why the police focused on Tench as a suspect in the murder case, the state was using it for precisely the purpose forbidden by Evid.R. 404(B): as *propensity* evidence. Why would Tench's being suspected of armed robbery make him the prime suspect in his mother's disappearance, unless the robbery shows that he has a propensity either for violent crime or for crime in general? Weinhardt and Schmitt, in their trial testimony, never suggested any noncharacter reason why Tench's suspected role in the robbery caused them to believe he was involved in Mary's disappearance. Nor does the state's brief offer any such explanation. Hence, the "early focus on Tench" explanation fails the second part of the *Williams* test—the evidence was presented to prove Tench's character and that he acted in conformity with that character— and is not an acceptable basis for admitting the robbery evidence.

{¶ 158} Furthermore, the "early focus on Tench" explanation does not account for the evidence the state used at trial. Borowske's testimony about the robbery included a number of events that occurred *after* the Brunswick police began to focus on Tench as a suspect in his mother's murder. Borowske testified that he participated in the search of Tench's home on November 13, 2013—the day after Brunswick detectives questioned Tench and took him into custody—and found a hooded sweatshirt similar to that worn by the Old Carolina Barbecue robber. He further testified that he interviewed Tench on November 13 and 15, that Tench

denied committing the robbery in those interviews, and that he interviewed Tench again in March 2014, at which time, Tench confessed to the robbery. None of this testimony has any bearing on why, on the morning of November 12, the Brunswick police focused on Tench as a suspect in his mother's disappearance. Similarly, Tench's statements to Kyker and Casey do not explain the police focus on Tench; there is no evidence that the police even knew about those statements before they started to investigate Tench.

{¶ 159} We conclude that admitting the Old Carolina Barbecue robbery evidence constituted an abuse of the trial court's discretion.

## 2. Deletions from Kyker's Phone and Facebook Account

{¶ 160} On direct examination, the prosecuting attorney asked Kyker whether "anything unusual ever happen[ed] with regard[] to [her] cellphone and * * * Facebook [account]." A defense objection was overruled, and Kyker testified that one morning when she and Tench were on vacation, she woke up, looked at her cell phone, and saw that she had received a text message from "another guy." She went back to sleep without deleting the message. Later that morning, she noticed that someone had deleted the message. She also testified, "[G]uys were deleted off my Facebook that I didn't delete." But Kyker did not testify that Tench had deleted these items, nor did the state introduce any evidence that he had. [6]

{¶ 161} "Evidence of other acts is admissible if * * * there is substantial proof that the alleged other acts were committed by the defendant * * *." *State v. Lowe*, 69 Ohio St.3d 527, 530, 634 N.E.2d 616 (1994). In this case, there was no evidence that Tench was responsible for the deletions. Even if he was, the deletions have no tendency to prove any fact of consequence to the determination of this case. Such evidence may throw light on Tench's relationship with Kyker, but it has nothing to do with whether he killed his mother.

---

[6] There was evidence that Tench accessed Kyker's e-mail and deleted a message from a male on November 12, 2013, however. Tench does not claim error in the admission of that evidence.

{¶ 162} The text-deletion evidence fails the first part of the *Williams* test: relevance. The trial court abused its discretion by overruling Tench's objection to admitting it.

### 3. Tench's Relationship with His Mother

{¶ 163} Tench argues that it was improper for the state to introduce Kyker's testimony that in October 2013, he had grabbed his mother's arm and made her cry. He further argues that it was improper for the state to introduce evidence of hostile statements he made to and about his mother in the months leading up to the murder. There were three such statements:

{¶ 164} Noreta Dean, a neighbor of the Tenches, testified that during the summer of 2013, Tench left the house, yelled, "Fuck you, bitch," at Mary, and sped away in his truck.

{¶ 165} Two of Tench's coworkers at the Old Carolina Barbecue in Fairlawn testified to things he said about his mother in October 2013. Sarah Morgan testified that while recounting an argument he had had with his mother, Tench said with apparent seriousness that he hated her. Juan Parrilla, Tench's supervisor, testified that Morgan had told him that Tench had said he hated his mother and wished she were dead. When Parrilla privately admonished Tench, he laughed and said, "Well, she might as well be [dead]."

{¶ 166} An emotion "is always relevant" to show "the probability of appropriate ensuing action." 1A Wigmore, *Evidence*, Section 118, at 1697 (Tillers Rev.1983). Thus, a defendant's hostility to a murder victim is relevant to whether he killed the victim. *See State v. Nields*, 93 Ohio St.3d 6, 22, 752 N.E.2d 859 (2001) (defendant's assault on victim several weeks before murder was admissible; it showed a "strained relationship" between defendant and victim, which tended to show motive and intent to kill); *State v. Allen*, 73 Ohio St.3d 626, 631, 653 N.E.2d 675 (1995) (evidence indicating defendant's hostility to victim cited to support guilty verdict).

{¶ 167} Tench's actions and statements showed that the relationship between him and his mother was strained during the summer and fall of 2013. Moreover, the state did not use them as proof of his bad character. Finally, Tench's actions and statements held high probative value, which the trial judge could reasonably find outweighed their potential for unfair prejudice. Accordingly, we conclude that the trial court did not err in admitting this evidence.

### 4. More Other-Acts Evidence

{¶ 168} **Statement implying possible theft by Tench:** Raymond Hull, a former general manager of the Old Carolina Barbecue in Strongsville, had originally hired Tench as a cook, promoted him to assistant general manager, and regarded himself as a mentor and father figure to Tench. On cross-examination, Hull testified that he had "never had a problem" with Tench.

{¶ 169} On redirect examination, Hull testified that Tench had run the restaurant's booth at a September 2013 cook-off. The prosecutor asked whether there had been any concerns about how Tench had performed his job. Hull responded: "There was some concerns but that was just speculation. There was nothing I could prove because *sometimes the bank wasn't adding up to what it should have been* so, you know, with us being brand-new and everything, we didn't know what the costs were and what was going out and what was coming in." (Emphasis added.) The defense did not object to either the question or the answer.

{¶ 170} Hull's testimony conveyed to the jury that he suspected Tench of stealing from the restaurant. Had there been any proof implicating Tench in such activity, it might have been relevant on redirect, because cross-examination had elicited that Hull had never had a problem with Tench. But as Hull frankly admitted, he had no such proof and was merely speculating. Absent substantial proof that the alleged other acts were committed by Tench, Hull's suspicions were irrelevant. *See Lowe*, 69 Ohio St.3d at 530, 634 N.E.2d 616.

{¶ 171} **Drug evidence:** BCI agent George Staley testified that on November 14, 2013, he went to the Brunswick police station to search Tench's Ford F-150 truck. In the driver's-side door pocket, he found a ziplock baggie containing a substance that he suspected was an illegal drug. Staley identified two photographs of the suspected drug, one of which was later admitted. A BCI forensic scientist who tested the substance in the baggie testified that it was alpha-PVP, a Schedule I stimulant also known as bath salts. The defense did not object to the testimony or the photos. (At the end of the state's case, the defense did object, unsuccessfully, to the admission of the actual drug bag.)

{¶ 172} Additionally, a United States Secret Service agent testified that he had extracted the data from Tench's cell phone. He identified two photographs found on the phone that depicted a clear baggie containing a crystalline substance.

{¶ 173} Again, this evidence was completely irrelevant. There was no evidence connecting the murder of Tench's mother with drugs in any way. We have held that evidence of a defendant's drug addiction was admissible to prove the defendant's need for money, providing a motive to rob and kill. *State v. Henness*, 79 Ohio St.3d 53, 61, 679 N.E.2d 686 (1997). But in this case, there was no evidence that Tench was a drug addict or even a user at the time of the murder.

{¶ 174} Also, the state's theory of motive had nothing to do with drug use. Tench was alleged to have killed his mother not to *obtain* money (as in *Henness*) but to prevent her from reporting thefts he had *already* committed. (At oral argument, the state asserted that Tench "had a lot to gain * * * in terms of an inheritance," but the state presented no such theory to the trier of fact.) *See State v. Hutton*, 53 Ohio St.3d 36, 40, 559 N.E.2d 432 (1990) (rejecting state's claim on appeal that other-act evidence was admissible to prove a particular motive for murder, after state had consistently argued in favor of a different motive at trial). And the drug evidence was not needed to prove that Tench had committed those thefts—the state introduced into evidence copies of the forged checks and expert

testimony that the forgeries were in Tench's handwriting. Thus, it was error to admit this evidence.

{¶ 175} **Google search:** A United States Secret Service agent examined the hard drive of the Dell computer seized from the basement of the Tench house. He testified that someone had typed the phrase "kill someone without getting caught" into the Google search engine, although he could not determine when this was done. The computer had last been shut down on April 11, 2013. That computer was registered to "Jimmy and Aubrey"; Tench, by his own admission, was known as Jimmy. Tench also testified at trial that a former girlfriend of his was named Aubrey.

{¶ 176} Typing that phrase into the computer was directly relevant evidence of intent, planning, and preparation. The state did not attempt to draw any inferences about Tench's character from it. Finally, we see no likelihood of unfair prejudice. Thus, admitting evidence of the Google search was not plain error.

### 5. Harmless Error

{¶ 177} "Error in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction." *State v. Lytle*, 48 Ohio St.2d 391, 358 N.E.2d 623 (1976), paragraph three of the syllabus, *vacated in part on other grounds*, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978). "[A]n improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 32.

{¶ 178} In this case, the properly admitted evidence of Tench's guilt is overwhelming. To begin with, his boots were stained with his mother's blood. BCI investigator Staley testified that the stains were spatter stains. He explained: "Spatter stains are produced by an external force being applied to liquid blood

which projects it airborne." In his opinion, the boots must have been present at a "spatter-producing event."

{¶ 179} There was additional evidence of guilt. Footprints in the snow led from the SUV containing his mother's body to the housing development where she and Tench lived. Moreover, although he called Kyker at 1:22 a.m. and told her he was worried about his mother's whereabouts, he did not try to call his mother until 2:03 a.m., and he never once tried to contact her workplace.

{¶ 180} All four of the Kyker-family witnesses testified that Tench did not act like his usual self on the night of the murder and that he left much earlier than was his habit. On the morning after the murder, Tench said to Raymond Hull: "I've done something that I need to talk to you about."

{¶ 181} Two days before the murder, Tench bought Nashua No. 394 duct tape and a tarpaulin, and he unwrapped both items (the wrappers were found in his basement). Expert testimony established that the duct tape around Mary's neck was Nashua brand, and it was No. 309, 394, or 398. The tarpaulin was wet when police discovered it, a fact from which the jury could reasonably infer that it had been used recently.

{¶ 182} At trial, Tench testified that he had never used the tarpaulin. He tried to explain the moisture on it by suggesting that it might have been deposited by a dryer vent inside the garage. But his explanation is unsatisfactory: the tarpaulin was rolled up, and the moisture was on the *inside* surface.

{¶ 183} The computers in the house yielded further evidence of Tench's guilt. Sometime before April 2013, the phrase "kill someone without getting caught" was Googled on what the jury could have reasonably inferred was Tench's Dell computer. And hours before Mary went missing, someone had used the Hewlett-Packard computer in Mary's room to access Google images of the field where Mary's body was later found.

**{¶ 184}** The next morning, Tench lied to Officer Scafidi about what he was doing the night before. He said he was in bed with Kyker when he fell asleep at 11:51 p.m., but Kyker and her family testified that Kyker slept at home that night after Tench left. Tench also told Scafidi that he did not wake up until 3:00 a.m. on November 12, contradicting his later account to detectives that he had woken up at 2:00 a.m. *Both* statements were false: testimony and phone records show that Tench called Kyker at 1:22 a.m. (In a November 13 interview with Schmitt, he changed his account by stating that he had woken up between 1:00 and 2:00 a.m.)

**{¶ 185}** During that phone call, Tench told Kyker that he had driven *twice* from Brunswick to Lakewood and back that night—once in his car, once in his truck. If, as he claimed, he was asleep when his mother called at 11:51 p.m., he must have begun this journey sometime after 11:51 p.m. But there was evidence that a one-way trip from Brunswick to Lakewood takes 30 to 35 minutes, so it seems unlikely, at best, that he made two round trips in dark, snowy conditions in less than two hours. Whether he did so even once is questionable; Schmitt testified that he looked at Tench's Hyundai on November 12 and found no salt on it and no snow caked underneath—which one would expect to find on a car driven a long way in the snow that morning.

**{¶ 186}** In his trial testimony, Tench changed his story yet again. He told the jury that he had gone to bed after his 11:15 p.m. conversation with his mother, and had slept for "maybe an hour at the most." Then he woke up and noticed he had missed his mother's call at 11:51. On finding she was not home, he went out looking for her; he drove his truck along the route she would have taken from work, but he drove the route only once. Then he went home and called Kyker.

**{¶ 187}** Tench told other lies, some notably clumsy. He falsely told both Scafidi and Weinhardt that his mother had left Ennis Court at 11:45 p.m. (We note that Tench spoke to his mother a minute or so after she actually left work, so clearly, he knew what time she left.) At a time when snow was on the ground, he claimed

he had been cutting the grass in his boots. He said he might have gotten the bruise on his arm in a mock fight with Kyker, but Kyker denied that she had ever hit him or bruised his arm. He also lied to Jonathan Casey about calling the FBI.

{¶ 188} When the detectives first visited Tench's home, at 1:00 p.m., November 12, Tench was running the dryer, and a basket of wet towels was sitting on top of the dryer. When the house was searched the next day, police found stains on a bleach bottle and on the washing machine that tested positive in a presumptive test for blood. A wet sponge in the kitchen trash also tested positive in a presumptive test for blood. So did a substance found on the kitchen sink. Each of these items points to an effort to clean up blood.

{¶ 189} Tench also walked over the footprints in his backyard, in what appeared to detectives to be a deliberate attempt to obscure them. After the detectives left his house on the afternoon of November 12, Tench moved the bloodstained boots upstairs to his bedroom.

{¶ 190} There was strong evidence of motive as well. The envelope with the "Leave/Tell police" notation in Mary's handwriting was found in Tench's bedroom, which shows he had known about it, and he admitted from the witness stand that he had known about it. The state also introduced abundant evidence of Tench's ill feeling toward his mother. In October alone, he told various people that she was driving him crazy, that he hated her, and that she might as well be dead. During an argument that same month, he grabbed her arm hard enough to make her cry.

{¶ 191} While the trial court erred in admitting evidence of other acts barred by Evid.R. 404(B), we hold that these errors are harmless, given the overwhelming evidence of Tench's guilt. Tench's bloodstained boots, his strong motive, his unusual behavior on the night of the murder, his anger toward his mother, his lies and shifting stories, the trail of footprints leading back to his neighborhood—these are the facts that prove that he killed Mary, and they would inevitably have done so

even if drugs, robbery, embezzlement, and deletions from cell phones had never been mentioned at his trial.

### 6. Carryover Effect in Penalty Phase

{¶ 192} When other-acts evidence has been properly admitted in the guilt phase, the jury may properly consider it in the penalty phase as well, insofar as it relates to Tench's " 'history, character, and background,' which a jury must consider in the penalty phase." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 51, quoting R.C. 2929.04(B).

{¶ 193} As noted above, some of the other-acts evidence in this case—particularly the Old Carolina Barbecue robbery evidence—was *improperly* admitted. But our independent review will "readily cure any carryover effect" of other-acts evidence erroneously admitted in the guilt phase. *State v. Davie*, 80 Ohio St.3d 311, 322, 686 N.E.2d 245 (1997). *See also State v. Dennis*, 79 Ohio St.3d 421, 432, 683 N.E.2d 1096 (1997) (independent review would eliminate any prejudicial impact improperly admitted gruesome photographs may have had on penalty phase).

{¶ 194} For the foregoing reasons, we overrule Tench's fifth proposition of law.

### B. Impeachment with Prior Inconsistent Statement

{¶ 195} In his eighth proposition of law, Tench contends that the trial court erred by refusing to allow him to impeach a prosecution witness with extrinsic evidence of a prior inconsistent statement. Although we agree that the trial court erred, we hold that the error is harmless.

{¶ 196} In its case-in-chief, the state called Kathleen McGuire, a nurse who worked on the assisted-living side of Ennis Court, where Mary also worked. On November 11 to 12, 2013, McGuire was working the 11:00 p.m. to 7:00 a.m. shift. She testified on direct examination that if anyone had telephoned Ennis Court that night, the call would have gone either to her or to the nurse working on the nursing-

home side. McGuire testified that she answered only one phone call that night and that the call was from the Brunswick police. She specifically testified that she never answered a call from Tench.

{¶ 197} On cross-examination, McGuire testified that a detective—Detective Hosta, she thought—had interviewed her by telephone after Mary's disappearance. Defense counsel asked McGuire, "So you didn't advise her that James had called two times?" McGuire answered no.

{¶ 198} Later, Brunswick police detective Sarah Merhaut, formerly, Sarah Hosta, testified for the state. On cross-examination, defense counsel asked Merhaut, "So if you wrote [in a report] that when you went to Ennis Court and Kathleen McGuire answered— [.]" The state objected to the question as calling for hearsay; the trial court sustained the objection. Defense counsel continued: "And you learned [from McGuire] that several calls were answered— [.]" Again the state objected, and again the trial court sustained the objection.

{¶ 199} At sidebar, defense counsel explained that Merhaut's report contained a statement by McGuire "that two calls were answered from James Tench," which was inconsistent with McGuire's direct-examination testimony that Tench had not called Ennis Court. The state argued, and the trial court agreed, that questioning Merhaut about McGuire's statement called for hearsay.

{¶ 200} The trial court erred; the defense was entitled to impeach McGuire by eliciting Merhaut's testimony about the prior inconsistent statement. Evid.R. 613 addresses impeachment by self-contradiction, that is, the use of a witness's prior inconsistent statements to impeach the witness. Evid.R. 613(B) provides:

> Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:
>
> (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior

opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;

(2) The subject matter of the statement is one of the following:

(a) A fact that is of consequence to the determination of the action other than the credibility of a witness * * *.

The rule "specifically contemplates the admission of extrinsic evidence of a prior statement under the circumstances outlined in Evid.R. 613(B)." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 125.

{¶ 201} The subject matter of McGuire's alleged statement was whether Tench had telephoned Ennis Court during the night of November 11 or morning of November 12, 2013. This was a "fact * * * of consequence to the determination of the action" within the meaning of Evid.R. 613(B)(2)(a). Accordingly, once McGuire denied making the statement, the rule entitled Tench to adduce extrinsic evidence—Merhaut's testimony—to show that she had made it, for the limited purpose of impeaching her credibility.

{¶ 202} The state argues that Evid.R. 613(B) does not apply, because the defense "did not attempt to impeach McGuire with McGuire's statement to Detective Merhaut when McGuire testified." This is simply wrong. In cross-examining McGuire, the defense gave her the "opportunity to explain or deny the statement," Evid.R. 613(B)(1), as the following passage from the trial transcript shows:

Q. [Defense counsel] * * * [Y]ou were asked on direct if you received any phone calls that evening from James Tench.

A. No, I didn't.

Q.  Did you interview with Detective Hosta?

A.  I had a detective call me on the phone but I'm not sure if that was the last name.  I think it was.

Q.  * * * Was that after Mary's disappearance?

A.  Oh, yeah.

Q.  Okay.  So *you didn't advise her that James had called two times?*

A.  *No*.

(Emphasis added.)

**{¶ 203}** The state also argues that McGuire's statement to Merhaut was "classic hearsay" that could be used to impeach McGuire only during McGuire's testimony.  This argument simply ignores Evid.R. 613(B).  The rule does not limit inconsistent-statement impeachment to cross-examination, but "specifically contemplates" the use of extrinsic evidence.  *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 125.

**{¶ 204}** And the state's hearsay concerns are misplaced, because extrinsic evidence of the prior inconsistent statement was admissible *only* to impeach McGuire.  The defense could not have used her prior inconsistent statement as hearsay, i.e., as substantive evidence that the matter asserted in the statement was true.  *See id.* at ¶ 128; *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 182-184.  Furthermore, the trial court could have given a limiting instruction to ensure that the jury would not misuse the prior inconsistent statement as substantive evidence.

**{¶ 205}** Because Evid.R. 613(B) entitled the defense to use extrinsic evidence of McGuire's prior inconsistent statement to impeach McGuire, the trial court erred by sustaining the state's objection to the attempted impeachment.  However, as we discuss above, the evidence of Tench's guilt is overwhelming.  We

therefore hold that the error was harmless. Tench's eighth proposition of law is overruled.

## C. Other Evidence Issues

### 1. Confrontation Issue

{¶ 206} In his sixth proposition of law, Tench challenges the testimony of Rachel Keaton, a forensic scientist in the latent-print section of BCI. Keaton testified that she examined four exhibits that had been processed by another latent-print examiner, who did not testify. Tench contends that Keaton's testimony violated the Sixth Amendment's Confrontation Clause because it was not limited to her own observations and conclusions but also communicated the substance of the nontestifying examiner's out-of-court statements. We agree. However, while Keaton's testimony did violate the Confrontation Clause, the defense did not object at trial, and the error was not plain error.

{¶ 207} Keaton testified that the four exhibits[7] were originally processed and examined by Dawn Limpert, a BCI latent fingerprint examiner who had since retired. Keaton had Limpert's notes with her while testifying and said that she was familiar with her findings. Keaton testified that there was no conflict between Limpert's findings and her own.

{¶ 208} Keaton explained that processing latent fingerprints involves the application of chemicals to make the fingerprints visible. Keaton testified that Limpert had applied particular chemicals to the surface of each exhibit. Keaton did not testify that she had seen Limpert apply these chemicals or that she was able to identify the chemicals she had used when she examined the exhibits.

{¶ 209} Based on her own visual examination of the exhibits, Keaton testified that she had found no fingerprint ridges on three of the exhibits and that

---

[7] The four exhibits about which Keaton testified are state's exhibit No. 158, the duct tape found around Mary's neck; state's exhibit No. 341, a roll of tape found in the kitchen at 758 Camden; state's exhibit No. 357, the rear license plate from Mary's SUV; and state's exhibit No. 363, a box of vinyl gloves found inside the SUV.

the ridges she had found on the fourth exhibit were insufficient to allow identification.

**{¶ 210}** The Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." This means that "admission of an out-of-court statement of a witness who does not appear at trial is prohibited * * * if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 34, citing *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 657, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011).

**{¶ 211}** To begin with, we agree with Tench that Keaton's testimony effectively communicated to the jury the substance of Limpert's out-of-court statements. Keaton testified that Limpert applied certain chemicals to the exhibits, a process she did not claim to have personally observed. Keaton further testified that her own conclusions as to the absence of identifiable fingerprints did not conflict with Limpert's. Thus we must determine whether Limpert's out-of-court statements were "testimonial" as that term is used in *Crawford* and its progeny.

**{¶ 212}** *Crawford* defined "testimony" as a "solemn declaration or affirmation made for the purpose of establishing or proving some fact" and held that the Confrontation Clause applies to those who "bear testimony." *Crawford* at 51. Although *Crawford* did not define "testimonial," it stated that the core class of statements implicated by the Confrontation Clause includes statements made under circumstances that would lead an objective witness to reasonably believe that the statement would be available for use at a later trial. *Maxwell* at ¶ 35. Later decisions applying *Crawford* have explained that "testimonial statements are those made for 'a primary purpose of creating an out-of-court substitute for trial

testimony.' " *Id.* at ¶ 40, quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct 1143, 179 L.Ed.2d 93 (2011).

{¶ 213} We conclude that Limpert's out-of-court statements were testimonial. In this case, a law-enforcement officer provided evidence to a state laboratory set up for the purpose of assisting police investigations. *See* R.C. 109.52 (BCI may operate a criminal-analysis laboratory and "engage in such other activities as will aid law enforcement officers in solving crimes and controlling criminal activity"); *compare Bullcoming*, 564 U.S. at 665, 131 S.Ct. 2705, 180 L.Ed.2d 610 (police sent evidence to a "state laboratory required by law to assist in police investigations").

{¶ 214} Citing *Maxwell* and *Williams v. Illinois*, 567 U.S. 50, 84, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012) (plurality opinion), the state argues that Limpert's findings were not testimonial, because they "were not prepared for the primary purpose of accusing a targeted individual." But the state's proposed targeted-individual test comes from the *plurality* opinion in *Williams.* It was specifically rejected by five justices and is not the law. *Id.* at 114-116 (Thomas, J., concurring); *id*. at 135-136 (Kagan, J., dissenting). *Williams* is also distinguishable because the defendant there was "neither in custody nor under suspicion" when the DNA sample was sent to the laboratory. *Id*. at 84. Tench was both under suspicion and in custody when Limpert examined the exhibits for fingerprints.

{¶ 215} As for *Maxwell*, we did not endorse the targeted-individual test in that case. Far from it; we described *Williams* as "not helpful to our resolution" of the Confrontation Clause issue decided there. *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 55.

{¶ 216} Clearly, Limpert's examination of the exhibits was conducted to establish past events potentially relevant to later criminal prosecution: whether Tench left fingerprints on items of evidence connected to the victim's body, her

house, or the vehicle in which the body was found. Hence, Limpert's statements about that examination were testimonial.

**{¶ 217}** As Tench concedes, he did not object at trial when Keaton testified about Limpert's statements. He cannot, therefore, prevail on this issue unless he establishes plain error. To show plain error, he must show that (1) there was an error, (2) the error was "plain," i.e., obvious, and (3) the error affected substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

**{¶ 218}** Tench's claim founders on the third requirement. To show that an error affected his substantial rights, Tench must show "a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Thus, he must show "that the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding." *United States v. Dominguez Benitez*, 542 U.S. 74, 83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004), quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶ 219}** Keaton testified that there was no conflict between her findings and Limpert's. And Keaton's finding was that there were no identifiable fingerprints on the items she examined. Even if the jury inferred that Limpert reached the same conclusion, that conclusion did not inculpate Tench in the charged offenses. Thus, the erroneous admission of Limpert's conclusion via Keaton's testimony does not undermine confidence in the trial's outcome. There is no reasonable probability that Tench was prejudiced by the error, which ultimately contributed nothing to the guilty verdict. We therefore overrule Tench's sixth proposition of law.

### 2. Testimony about Content of Video

**{¶ 220}** Tench repeatedly claimed that he had searched for his mother during the morning of November 12 by driving the route she would have taken to get home from her workplace. At trial, Detective Schmitt testified that he checked

this claim by reviewing traffic-camera video taken at the intersection of State Route 303 and I-71 from 11:00 p.m., November 11, to 4:00 or 5:00 a.m., November 12, 2013. Schmitt did not see Tench's Ford F-150 at that intersection in the video footage he reviewed. The video itself was not introduced or played at trial (presumably due to its length). Tench did not object at trial to Schmitt's testimony.

{¶ 221} In his seventh proposition of law, Tench contends that Schmitt's testimony about the video was inadmissible for three reasons. First, he contends that Schmitt's testimony was improper lay-opinion testimony, violating Evid.R. 701, which permits lay opinions that are "rationally based on the perception of the witness and * * * helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." He contends that "only an expert [could] make a determination of the accuracy of the video." This claim fails because Schmitt did not offer any opinion regarding the video; he merely testified to what he saw when he viewed it.

{¶ 222} Second, he contends that Schmitt could not testify to the content of the video, because the video itself was not authenticated pursuant to Evid.R. 901(A). Tench has not raised an argument under Evid.R. 1002, which governs the admissibility of evidence offered to prove the content of a recording.

{¶ 223} Evid.R. 901(A) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *See generally Midland Steel Prods. Co. v. Internatl. Union, United Auto., Aerospace & Agricultural Implement Workers of Am.*, 61 Ohio St.3d 121, 130, 573 N.E.2d 98 (1991) (discussing methods of authenticating video recordings); *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 150-151.

{¶ 224} The video was neither introduced into evidence nor authenticated, and no foundation was laid for the admissibility of Schmitt's testimony. But even if it was error for the detective to testify as to the content of an unauthenticated

video, it did not constitute plain error. As detailed above in our discussion of Tench's fifth proposition, there was overwhelming evidence of guilt; thus, the testimony about the traffic-camera video does not undermine confidence in the jury's finding of guilt.

{¶ 225} Finally, Tench contends that the video "was never provided to or reviewed by defense counsel" and that "defense counsel was unable to adequately cross examine the witness[ ] without viewing the video or having it analyzed by an expert." He contends that "[i]t was error for defense counsel not to object to that testimony let alone failing to demand the video for analysis."

{¶ 226} This appears to be a claim of ineffective assistance of counsel— although Tench does not cite or discuss the standard governing ineffective-assistance claims—and also a claim that discovery was improperly withheld. Neither claim is factually supported: Tench cites nothing in the record to show that defense counsel was not provided with the video.

{¶ 227} We overrule Tench's seventh proposition of law.

### D. "Irrelevant and Prejudicial" Evidence

{¶ 228} In his ninth proposition of law, Tench contends that the state introduced "irrelevant and prejudicial" evidence against him, specifically Morgan's testimony that Tench said he hated his mother and Parrilla's testimony that Tench had said his mother might as well be dead. We have already discussed the admission of these statements in analyzing Tench's fifth proposition of law. The statements were relevant to show motive, and their admission was not plain error. Hence, Tench's ninth proposition of law lacks merit, and we overrule it.

### V. Attorney-Client Privilege

{¶ 229} Tench's cousin Sarah Verespej is a lawyer. She communicated with Tench on November 12, both before and after his arrest. She later testified against Tench both in the suppression hearing and at trial, repeating things he had told her. In his fourth proposition of law, Tench contends that he believed Verespej

was his attorney and her testimony at trial thus violated the attorney-client privilege, R.C. 2317.02(A)(1).

{¶ 230} At trial, Verespej testified that her parents called her on the morning of November 12, after they learned that Mary had not returned home from work the night before. They asked her to "coordinate efforts to find out what had happened" and to hire a private investigator, which she did. They also wanted her to talk to Tench, because they thought he "may have somehow been involved in Mary's disappearance."

{¶ 231} On the morning of November 12, Verespej spoke with Tench on the phone and exchanged text messages with him. That morning, she testified, Tench told her that he had driven the route that Mary would have taken home. In a text message, he told Verespej that he had called Verizon and learned that there was no way to track Mary's phone because the phone was not equipped with GPS.

{¶ 232} After being taken to the police station, on November 12, Tench told Detective Weinhardt that he needed a number from his cell phone to call his attorney, whom he identified as his cousin Sarah. When Verespej arrived at the station, she identified herself as Mary's niece or as Tench's cousin, not as his attorney. The detectives arranged for Verespej and Tench to speak privately. After they spoke, Verespej told the detectives what Tench had said during their meeting.

{¶ 233} Verespej testified that at the police station, Tench "reiterated that he had driven the route, that he wanted to be out there looking for who did this to his mother, that he was concerned that she was such a nice person that she might have picked someone up in the snowstorm." Tench told Verespej that he had been cleaning the floors because Mary had asked him to and he wanted that to be done when she came home. He told her the police had taken the boots he wore to walk the dogs. He said that he had just buried his father, and asked why he would do anything to his mother.

**{¶ 234}** Evidentiary privileges are "governed by statute enacted by the General Assembly or by principles of common law as interpreted by the courts of this state in the light of reason and experience." Evid.R. 501. The attorney-client privilege is covered by a statute: R.C. 2317.02(A)(1) provides that an attorney may not testify about "a communication made to the attorney by a client in that relation" unless the client either waives the privilege or "voluntarily reveals the substance of attorney-client communications in a nonprivileged context." (There are exceptions, *see* R.C. 2317.02(A)(1)(a), (A)(1)(b), and (A)(2), but none apply here.) Moreover, "[t]he rule with respect to privileges applies at all stages of all actions, cases, and proceedings conducted under these rules." Evid.R. 101(B). The burden of showing that the privilege applies rests on the party asserting the privilege. *Waldmann v. Waldmann*, 48 Ohio St.2d 176, 178, 358 N.E.2d 521 (1976); *Ex parte Martin*, 141 Ohio St. 87, 103, 47 N.E.2d 388 (1943).

**{¶ 235}** We need not decide whether Tench sustained his burden of showing that the attorney-client privilege applied to the communications repeated in Verespej's trial testimony. Even if we assume that the trial court erred in rejecting Tench's assertion of the privilege, we find that any error was harmless.

**{¶ 236}** An error in the admission of privileged testimony is harmless if the testimony had no impact on the verdict and the remaining evidence supporting guilt is overwhelming. *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 36-37. Verespej's testimony readily meets the standard articulated in *Harris.*

**{¶ 237}** Tench's statements to his cousin were mostly self-exculpatory; none of them were self-incriminating. Indeed, when testifying in his own defense, Tench told the jury some of the same things he had told his cousin. He testified about driving his mother's route to search for her. He told the jury that Mary had asked him to clean the carpet. He testified that when he was arrested, he said to the detectives, "I need to go find who did this, too."

**{¶ 238}** Moreover, almost all the statements Verespej testified that Tench had told her on November 12 were things that Tench had already said, or would later say, to Brunswick police officers or others. And those statements were also introduced at trial. For instance, he told Christina Kyker, Officer Scafidi, and Detectives Weinhardt and Schmitt that he had searched for Mary by driving the route to her workplace. He said to Weinhardt: "I did not do this. I buried my dad last year."

**{¶ 239}** He also told the detectives that he wanted to find out who did this to his mother, that Mary was a "nice" person who might have picked up a hitchhiker on a cold night, and that Mary had been asking him to clean the carpet. The detectives themselves testified that they took Tench's boots. Thus, Verespej's testimony was cumulative of other trial testimony.

**{¶ 240}** Finally, as we explained above in discussing Tench's fifth proposition of law, the evidence supporting Tench's guilt was overwhelming. Any error in the admission of Verespej's testimony was harmless beyond a reasonable doubt. Accordingly, we overrule Tench's fourth proposition of law.

## VI. Prosecutorial Misconduct

**{¶ 241}** In his tenth proposition of law, Tench claims prosecutorial misconduct.

**{¶ 242}** In his opening statement, the prosecutor said Mary had removed Tench as a beneficiary from her annuity with one insurance company and had had contact with another insurance company for the same purpose. The state did not support these claims with any evidence at trial. The state argues that this was not misconduct, because the record does not demonstrate bad faith. But what matters "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Thus, the question is whether the error "made [Tench's] trial so fundamentally unfair as to deny him due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d

431 (1974). Here it did not. The discussion of this subject was brief and not particularly "important to the prosecution's case in chief." *Id.* at 647.

{¶ 243} Tench also contends that it was misconduct for the state to elicit Kyker's testimony about deletions from her Facebook account and cell phone. But the trial court overruled a defense objection to this testimony. As we discuss above, the trial court erred by allowing the testimony. Nevertheless, "it is not prosecutorial misconduct to introduce evidence that the trial court has determined to be admissible." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 187. We therefore reject Tench's claim that the prosecutor was guilty of misconduct.

{¶ 244} Tench notes that the prosecutor mentioned the death penalty in the guilt-phase closing argument: "[I]n a case that we're going to ask for the ultimate penalty, we wanted to give you everything we could." But Tench did not object to this, and it is not plain error. *See State v. Brown*, 38 Ohio St.3d 305, 316, 528 N.E.2d 523 (1988) (finding harmless error when remarks did not urge jury to disregard evidence and convict solely to impose death sentence).

{¶ 245} Finally, Tench complains that the prosecutor misused the Old Carolina Barbecue robbery other-acts evidence in the guilt-phase closing argument to attack his character by pointing out that he had denied to various people that he had committed the robbery. But again, Tench did not object to this at trial, and in view of the overwhelming evidence of guilt, we cannot find plain error.

{¶ 246} We overrule Tench's tenth proposition of law.

### VII. Sentencing Issues
### A. Readmission of Guilt-Phase Evidence

{¶ 247} In his 12th proposition of law, Tench argues that the trial court erred by permitting the state to readmit in the penalty phase all the evidence that had been submitted to the jury in the guilt phase with the exception of four exhibits involving drugs and one involving allegedly stolen identification documents, all of

which the state withdrew.[8]  Defense counsel did not object to the readmission; indeed, during a status conference before the penalty phase, counsel conceded that under the case law, "most of the trial evidence can be presented at the penalty phase."

{¶ 248} Because the defense did not object, we review this issue under the plain-error standard.  Tench's specific complaints in this proposition relate to gruesome photographs and other-acts evidence.  As to the photographs, we have repeatedly held that evidence depicting the nature and circumstances of the offense, including allegedly gruesome photographs, is relevant to, and may be considered in, the penalty phase.  *See State v. Stumpf*, 32 Ohio St.3d 95, 512 N.E.2d 598 (1987), paragraph one of the syllabus; *State v. Hill*, 75 Ohio St.3d 195, 201, 661 N.E.2d 1068 (1996); *State v. Fears*, 86 Ohio St.3d 329, 345, 715 N.E.2d 136 (1999), quoting *State v. DePew*, 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542 (1988).  The other-acts evidence was improperly admitted in the guilt phase, but as we note above, our independent review will eliminate any carryover effect.  *Davie*, 80 Ohio St.3d at 322, 686 N.E.2d 245.  Tench's 12th proposition of law is therefore overruled.

## B.  Penalty-Phase Instructions

### 1.  Other-Acts-Evidence Instruction

{¶ 249} In his 13th proposition of law, Tench contends that the trial court committed plain error by giving the following penalty-phase instruction, to which the defense did not object, dealing with other-acts evidence:

---

[8] The four exhibits that were admitted during the guilt phase of the trial that were not submitted to the jury in the penalty phase were state's exhibit No. 350, the bag containing bath salts found in Tench's truck; state's exhibit No. 796, a photo of that bag; state's exhibit No. 850, a photo of the photocopies of Carlos Perez's state-issued identification card and Social Security card; and state's exhibit Nos. 938 and 939, photographs extracted from Tench's cell phone depicting a bag containing a crystalline substance.

> Evidence was previously received about the commission of crimes, wrongs, or acts other than the offenses with which the Defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character. You may consider that evidence only for the purpose of *deciding whether it proves the Defendant's motive, opportunity, intent or purpose, preparation or plan to commit the offense charged in this case*. This evidence cannot be considered by you for any other purpose.
>
> You will consider *all of the evidence admitted during the sentencing phase* together with the Defendant's own statement.

(Emphasis added.)

{¶ 250} Tench argues that this instruction was erroneous for two reasons. First, the instruction to consider "all of the evidence admitted during the sentencing phase" included the guilt-phase evidence readmitted at sentencing. Thus the prejudicial carryover effect of the improperly admitted other-acts evidence was "compounded," he argues.

{¶ 251} Second, Tench argues, the "limited purpose" for which the court told the jury it could consider the other-acts evidence—"deciding whether it proves the Defendant's motive, opportunity, intent or purpose, preparation or plan to commit the offense charged in this case"—had no relevance at the penalty phase. We agree: the defendant's guilt had been determined in the guilt phase and did not need to be relitigated in the penalty phase. *See generally State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), syllabus (residual doubt of guilt is not a

mitigating factor).  Thus, the other-acts limiting instruction given here, while proper in the guilt phase, was out of place in the penalty phase.

{¶ 252} On the other hand, the jury was specifically told that it could consider the other-acts evidence for no purpose *except* deciding whether it proved the defendant's motive, opportunity, intent, purpose, preparation, or plan to commit the offense charged in this case.  Thus, it is questionable whether the jury considered the evidence in the penalty phase at all.  Accordingly, Tench cannot show a reasonable probability that the alleged error resulted in prejudice, and hence cannot show plain error.  *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 22.  And even if the jury did consider it, our independent review will eliminate any prejudice, as we note above in discussing Tench's 5th proposition of law.  We overrule his 13th proposition of law.

### 2.  Mercy

{¶ 253} In his 15th proposition, Tench contends that he was entitled to have the jury instructed to consider mercy in its penalty-phase sentencing deliberations.  But we have long held that mercy is not a mitigating factor and that capital defendants are not entitled to have the jury instructed on mercy.  *See, e.g., State v. Wilks*, __ Ohio St.3d __, 2018-Ohio-1562, ___ N.E.3d ___, ¶ 179, 224; *State v. Sowell,* 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 131; *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 88; *State v. Lorraine*, 66 Ohio St.3d 414, 418, 613 N.E.2d 212 (1993) ("Mercy * * * is irrelevant to the duty of the jurors").  Tench's 15th proposition lacks merit.

### C.  Denial of Continuance

{¶ 254} On the day Tench was to be sentenced, the defense asked for a continuance to investigate allegations that Tench's father had sexually abused his children.  The trial court's refusal of this request is the subject of Tench's 14th proposition of law.

{¶ 255} The jury returned its penalty-phase recommendation of death on April 5, 2016, and was discharged. Sentencing was scheduled for April 25, 2016. During the interim, the trial court received a letter from a maternal cousin of Tench's. The letter discussed an allegation by the writer's sister, J.M., that Tench's father had sexually abused J.M. more than 20 years prior. The letter stated that Tench's father had entered a guilty plea to "acts of sex abuse," but the Tench family refused to believe that Tench's father had molested J.M. The letter did not assert that Tench himself was abused, but did describe his father as "very troubled," "manipulative, deceitful, [and] abusive."

{¶ 256} The trial court provided copies of the letter to both parties. On the morning of Tench's scheduled sentencing, the defense orally requested a continuance of four to six weeks to investigate the letter's claims.

{¶ 257} The trial court held a hearing that day. At the hearing, the state introduced copies of police reports and reports by Medina County Job and Family Services ("JFS") that—as defense counsel conceded—had been provided to the defense in discovery. These reports contained information about sexual-abuse allegations similar to those described in the letter.

{¶ 258} The reports disclosed that in 1996, J.M. accused Tench's father of molesting her nine years earlier and that Tench's father was ultimately convicted of four counts of gross sexual imposition. In 2001, the reports stated, J.M. reported to Brunswick police that she had seen Tench's father anally rape Tench in 1992, when Tench was 6 years old; she also reported having seen Tench's father sexually abuse Tench's sister. Both Tench and his sister denied any sexual abuse, and the case was closed.

{¶ 259} The state also introduced reports written by Tench's court-appointed psychologists. Both stated that Tench denied having been sexually molested. However, defense counsel stated that when they discussed the letter with Tench, he said he was not sure whether he had been molested.

**{¶ 260}** Defense counsel submitted an affidavit by Dr. John Fabian, one of Tench's psychologists. Fabian's affidavit states that defense counsel contacted him with what he described as "newly discovered information that * * * was not discovered at the time of his mitigation hearing." The affidavit did not state specifically what that information consisted of, however. Fabian stated that this information "caused serious concern" as to whether "there may be further mitigation evidence," and he recommended further investigation and follow-up interviews with Tench.

**{¶ 261}** The trial court denied the motion for continuance, finding that there was no new evidence in the letter. The court then proceeded to pronounce sentence.

**{¶ 262}** The grant or denial of a continuance is entrusted to the discretion of the trial judge. *Jones*, 91 Ohio St.3d at 342, 744 N.E.2d 1163. The trial court found that the letter contained no information not already known to the defense. The record supports that finding. Defense counsel conceded that they had been given the police and JFS reports in discovery. Defense counsel interpreted the letter as indicating the existence of "other information that ought to be investigated," but we see no basis for that. The letter's allegation about the molestation of Tench's cousin is thoroughly covered by the police and JFS reports. Indeed, the reports contain material much more favorable to Tench than anything stated in the letter, since they discuss allegations that Tench and his sister were abused.

**{¶ 263}** Tench does not explain what information in the letter was previously unknown to the defense. Because the record shows nothing to justify an eleventh-hour continuance of Tench's sentencing, the trial court did not abuse its discretion by denying the motion. We therefore overrule Tench's 14th proposition of law.

## VIII. Ineffective Assistance

**{¶ 264}** In his 11th proposition of law, Tench contends that his trial counsel rendered ineffective assistance. To establish ineffective assistance, Tench must

show: (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. *Strickland*, 466 U.S. at 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

{¶ 265} Tench argues that if we find that an ineffectiveness claim cannot be determined without resort to evidence outside the record, we should defer ruling on that claim so that it may be addressed in postconviction proceedings. However, there is no authority requiring this court to defer ruling on an ineffectiveness claim on direct appeal when the trial record does not support the claim. Tench cites *State v. Madrigal*, 87 Ohio St.3d 378, 390-391, 721 N.E.2d 52 (2000), but in *Madrigal* we did not defer ruling on unsupported claims; we simply rejected them. Thus, *Madrigal* supports the conclusion that if an ineffectiveness claim cannot be sustained without evidence outside the record, we should reject it on direct appeal. *See also State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 76.

{¶ 266} Tench principally contends that his counsel were ineffective because they failed to object to the "irrelevant and prejudicial" testimony of Morgan and Parrilla repeating Tench's statements about his mother. As discussed above, however, those statements were relevant. *See* discussion of Tench's fifth and ninth propositions of law. Any objection would have been properly overruled; Tench's counsel were not deficient for failing to raise this meritless objection. *See*, *e.g.*, *State v. Tibbetts*, 92 Ohio St.3d 146, 167, 749 N.E.2d 226 (2001).

{¶ 267} Parrilla also testified without objection that another employee, Eric Knott, had complained that Tench said something to him about hating his mother. Tench points out that, unlike Morgan, Knott did not testify.

{¶ 268} However, Knott's statement to Parrilla was admissible for a nonhearsay purpose. Parrilla testified to a statement Tench made to him while he was admonishing Tench for what he had said to Morgan and Knott. Thus, Knott's statement to Parrilla helped explain why he and Tench were having the conversation in the first place. An objection would have been properly overruled. In any event, the statement Parrilla attributed to Knott about Tench hating his mother was cumulative to Morgan's similar, but properly admitted, statement. Consequently, we find neither deficient performance nor prejudice in defense counsel's failure to object.

{¶ 269} Jonathan Casey testified that Tench told him in October 2013 that his mom was driving him crazy and "he couldn't stay there anymore." Although Tench's brief is not entirely clear, he seems to be arguing that his counsel erred by failing to object to that testimony. If so, that choice by defense counsel was not deficient performance; Casey's testimony, like that of Morgan and Parrilla, was relevant to show the strained relationship between Tench and the victim.

{¶ 270} Casey also testified that there were two managers at Old Carolina Barbecue with whom Tench had "had a problem." Tench was not happy with one of the managers, Casey recalled, because he was "hard on everybody." Casey also mentioned that there had been "some other controversy" involving that manager, but he could not remember what it was. As to the other manager, Casey testified that "there was some— a lot of tension between" him and Tench. Tench contends that his counsel should have objected to this testimony. However, he fails to explain how the testimony was prejudicial.

{¶ 271} Tench also claims that his counsel rendered ineffective assistance by failing to object to Raymond Hull's testimony about the money not adding up after the cook-off and to the introduction of the evidence of the bath salts found in his truck. We have discussed these issues in relation to Tench's other-acts-evidence claim. This evidence was inadmissible, but because the evidence of Tench's guilt

is overwhelming, its admission was neither plain error under Crim.R. 52(B) nor prejudicial under *Strickland*. Similarly, we find no prejudice in counsel's failure to object to testimony about Tench's use of fraudulent credit cards and about other people's tax returns being found in Tench's bedroom.

**{¶ 272}** Tench recasts his sixth proposition of law (the Confrontation Clause issue) and his seventh proposition of law (Detective Schmitt's testimony about the traffic-camera video) as ineffective-assistance claims predicated on trial counsel's failure to object to the allegedly erroneous testimony. Again, we hold that these issues do not meet the *Strickland* standard of prejudice.

**{¶ 273}** While cross-examining BCI investigator Staley, defense counsel elicited testimony that a state-issued identification card belonging to Carlos Perez was found with the drugs. Presumably the purpose of eliciting this testimony was to suggest that the drugs did not belong to Tench. Unfortunately, eliciting this information led to other information unfavorable to the defense. On redirect, the state brought out that the identification card that the defense counsel had referred to was actually a photocopy of the card and that a photocopy of the same man's Social Security card had also been found in the truck. In closing argument, the prosecutor used these facts to argue that Tench had stolen Perez's identification. Tench contends that counsel rendered ineffective assistance by eliciting the testimony about the identification card. Nonetheless, given the overwhelming evidence of guilt in this case, counsel's alleged lapse does not meet *Strickland*'s standard for prejudice.

**{¶ 274}** Tench complains that his counsel did not object to the prosecutor's reference to evidence relating to the Old Carolina Barbecue robbery during guilt-phase closing arguments to attack Tench's character. But again, in light of the overwhelming evidence of guilt, counsel's failure to object cannot be found prejudicial under *Strickland*.

{¶ 275} Finally, Tench complains that counsel did not object to the other-acts instruction in the penalty phase. But as we note in addressing his 13th proposition of law, Tench cannot show a reasonable probability that this alleged error resulted in prejudice.

{¶ 276} We overrule Tench's 11th proposition of law.

## IX. Cumulative Error

{¶ 277} In his 16th proposition of law, Tench contends that cumulative errors by the trial court rendered his trial unfair, entitling him to a reversal of his convictions, or at least of his death sentence. *See generally State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987). Under the doctrine of cumulative error, we may reverse a judgment of conviction "when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 223.

{¶ 278} It is true, as we have said in this opinion, that the trial court committed errors. Over objection, it erroneously admitted other-acts evidence irrelevant to Tench's guilt, and it erroneously kept him from impeaching Kathleen McGuire with extrinsic evidence of her prior inconsistent statement. But the evidence of Tench's guilt, as we have also said, was overwhelming. We hold that none of these errors, singly or together, deprived Tench of a fair trial. We therefore overrule his 16th proposition of law.

## X. Settled Issues

{¶ 279} Tench's 17th proposition argues that Ohio's capital-sentencing procedures violate the Sixth Amendment right to a jury trial as construed in *Hurst v. Florida*, __ U.S. __, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). But we have recently rejected that contention. *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56. On authority of *Mason*, we overrule Tench's 17th proposition of law.

**{¶ 280}** Tench's 18th proposition raises several arguments against the constitutionality of the death penalty and the statutes governing its imposition, including that they constitute cruel and unusual punishment, violate the rights to due process and equal protection, are arbitrary and vague, burden the right to a jury, prevent adequate appellate review, and violate international law. We have rejected each of these arguments. *See*, *e.g*., *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 106, 109-110, 113, 116-117, 120; *State v. Jenkins*, 15 Ohio St.3d 164, 168-173, 473 N.E.2d 264 (1984). We summarily overrule Tench's 18th proposition of law. *See generally State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568 (1988), syllabus; *State v. Spisak*, 36 Ohio St.3d 80, 81, 521 N.E.2d 800 (1988).

## XI. Independent Sentence Review

**{¶ 281}** Finally, under R.C. 2929.05, we must independently review Tench's death sentence. We must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to those affirmed in similar cases.

### A. Aggravating Circumstances

**{¶ 282}** The jury found three aggravating circumstances: two under R.C. 2929.04(A)(7) (Tench committed the offense while committing aggravated robbery and kidnapping) and one under R.C. 2929.04(A)(8) (victim was a witness to an offense who was purposely killed to prevent her testimony in any criminal proceeding). We hold that the evidence supports the latter two findings, but does not support the jury's finding that Tench committed the offense while committing aggravated robbery.

### 1. Aggravated Robbery

**{¶ 283}** At trial, the state asserted that Tench's taking of Mary's purse was the underlying theft offense to support the robbery-murder aggravating

circumstance. The purse was found in the retention pond in the field where Mary's body was found in her SUV, and footprints led from the SUV to the edge of the pond and then out of the field. However, there is no evidence that anything was removed from the purse, which contained credit cards and about $105 in cash when police removed it from the pond.

{¶ 284} The state has argued, both at trial and at oral argument before us, that the evidence showing that Tench had thrown the purse into the retention pond was sufficient to support the R.C. 2929.04(A)(7) aggravated-robbery specification, because the act was done with the intent to permanently deprive the purse's owner of the purse.

{¶ 285} We begin our analysis of this issue with the words of R.C. 2929.04:

(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment * * * and proved beyond a reasonable doubt:

* * *

(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit * * * aggravated robbery * * *.

Aggravated robbery, R.C. 2911.01, is defined as follows:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

Thus, a finding of an aggravated-robbery death specification must be predicated on the defendant's commission of a "theft offense."

**{¶ 286}** The jury in this case was instructed on only one theft offense: theft, R.C. 2913.02. That provision defines the offense as follows: "(A) No person, with purpose to deprive the owner of property * * * shall knowingly obtain or exert control over * * * the property * * * (1) Without the consent of the owner * * *. Thus, to find Tench guilty of the robbery-murder death specification, the jury was required to find that he "knowingly obtain[ed] or exert[ed] control over * * * property" without the owner's consent and with purpose to deprive the owner of the property. The jury could reasonably have found that Mary's killer threw the purse into the pond after the murder and thereby "exert[ed] control over" it. But to find Tench guilty of aggravated robbery, on which the robbery-murder aggravating circumstance was predicated, the jury must have found that by doing this he deprived the owner of the purse or its contents and that his purpose in doing so was to deprive the owner of the property. In our view, the evidence fails to support either finding.

**{¶ 287}** R.C. 2913.01 defines the term "deprive" as follows:

(C) "Deprive" means to do any of the following:

(1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;

(2) Dispose of property so as to make it unlikely that the owner will recover it;

(3) Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return * * * and without reasonable justification or excuse for not giving proper consideration.

**{¶ 288}** Tench's actions do not fit the definition of "deprive" under R.C. 2913.01(C). Certainly he disposed of the purse. But he threw it into a retention pond, where it was visible even under the ice, and left a trail of footsteps in the snow that drew police attention to it.

**{¶ 289}** The state also failed to prove that Tench's *purpose* was to deprive the owner of the purse. At oral argument, the state conceded that Tench's reason for taking the purse was unclear. If anything, the facts here suggest that, after killing his mother, Tench did not want to be caught with her purse in his possession, so he simply got rid of it. Why he took it in the first place, instead of leaving it at the scene, we do not know and may not speculate.

### 2. Kidnapping

**{¶ 290}** We hold that the evidence supports the kidnapping specification. The trial court instructed the jury on kidnapping under R.C. 2905.01, which provides:

(A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found, or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter * * *.

The chief question is whether Mary was still alive when she was removed from the place where she was found.

**{¶ 291}** The state's theory was that Tench assaulted Mary outside the house, then placed her in the back of the SUV and drove her to the field. The presence of blood in front of the house, and its relative absence inside—Detective Schmitt testified that he saw no evidence of a beating or "bloodletting event" anywhere in the house—support the state's contention that the initial assault took place outside.

**{¶ 292}** Common sense suggests that after assaulting his mother outside the house, Tench would want to remove her from public view as quickly as possible. The relative absence of blood inside the house also suggests that he did not take Mary inside after assaulting her, but bundled her into the SUV and transported her to the field, where he could complete the murder in darkness and away from the view of possible witnesses.

**{¶ 293}** Tench had at least 20 minutes from his first assault on Mary to transport her while she was alive. We know this because at some point during his attacks on Mary, one of her teeth was knocked out and she swallowed it. The medical examiner testified that during the autopsy, the tooth was found in Mary's intestines, that it would take 20 to 30 minutes for the body's functions to move the tooth to that location after she swallowed it, and that Mary must have been alive during that period. So the evidence supports a finding that Mary was still alive when taken to the field, and thus supports the jury's finding of the kidnapping-murder specification.

### 3. Witness-Murder Specification

**{¶ 294}** Finally, we must determine the sufficiency of the evidence to support the witness-murder specification under R.C. 2929.04(A)(8):

> The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent the victim's testimony

in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness * * *.

The principal evidence on this point was the note in Mary's handwriting that said, "Leave," and "Tell police," which police found in Tench's bedroom. The note's presence in Tench's room shows that he knew Mary was considering complaining to the police about his thefts. Moreover, there was evidence that Tench had monitored Mary's e-mails using his cell phone and had deleted an e-mail headed "Confidential Message for Address Only" that Discover had sent to his mother on November 5, 2013. We hold that the evidence supports the jury's finding of guilt on the R.C. 2929.04(A)(8) specification. *See State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 200-203; *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 56.

## B. Defendant's Evidence in Mitigation

{¶ 295} Tench called ten penalty-phase witnesses, all but one are friends, acquaintances, or relatives of his.

{¶ 296} Tench's uncle Gregory Tench testified that Tench had had ongoing "issues and problems" with his father, James Tench Sr., who died in April 2012. According to Gregory, Tench's father had been "pretty hard on" Tench. Gregory described James Sr. as a short-tempered man, prone to "fly off the handle" in response to "a minor situation." Tench often asked Gregory to mediate between him and his father, "to calm him down, get him in a better frame of mind."

{¶ 297} In contrast, Gregory testified, Mary's attitude toward Tench was "[a]lways positive, very good." The last time Gregory saw Mary, she was "very proud" of Tench because he had been promoted at work.

**{¶ 298}** Mary Pat Glover was first cousin to Tench's father. She drove from West Virginia to Medina to testify that she cared about Tench very much and saw him as "a very fine young man."

**{¶ 299}** Felicia Fedarko had been Tench's friend since seventh grade. She said he had always been there for her. When she was 15 and he was 16, he drove her to summer school; when she moved out of her mother's house at 18 and had nowhere to go, Tench persuaded his parents to let her stay with them. Felicia's mother, Diane Fedarko, said Tench was "always a gentleman," and she praised his "big heart."

**{¶ 300}** Brett Gilley testified that he has known Tench since 2005, when they both lived in Georgia. They were coworkers at a restaurant and became friends and roommates. Gilley also ran a plumbing business, and he hired and trained Tench to help with plumbing jobs. Tench left Georgia, but moved back in 2012. In the interim, Gilley and Tench frequently visited each other and traveled together. According to Gilley, sometime in 2012, Tench received a phone call from his mother relaying test-result information and Tench was upset and immediately moved back to Ohio to take care of her. Gilley regarded Tench as a brother and drove up from Tennessee to testify for Tench because his life was at stake. He said: "I would give him anything he needs because I know I'll get it back and get it back better."

**{¶ 301}** Sierra Mason, who lives in Georgia, has known Tench since 2012. When she met Tench, he was sleeping on Gilley's couch; Mason offered him the extra bedroom in her apartment, and he stayed about four months. She testified that Tench was "overall a good guy": funny, caring, respectful, hardworking, and generous. He paid his bills on time and was trusted around Mason's young daughter. Mason regards Tench as a brother, trusts him, and—despite knowing what he had been found guilty of—does not think he has "a bad bone in his body."

{¶ 302} Father Neil Walters, the Cuyahoga County jail chaplain, interacted with Tench every week or two during the three to four months Tench was jailed there. He found Tench friendly, respectful, and a good inmate who presented no disciplinary problems. Tench attended church regularly in jail, which according to Walters is sometimes "tough" for inmates because attending church subjects them to criticism. Two Medina County jail correctional officers testified that Tench was always respectful, followed orders, and did not create problems. One testified that Tench helped newer inmates and even jail staff, and noted that Tench was assigned as a porter, which is considered a privilege. This officer also conceded that while facing trial, Tench had a motivation to be on his best behavior.

{¶ 303} Kathleen Kovach, a member of the state parole board, explained to the jury when and if an inmate would get a parole hearing if he were sentenced to life without the possibility of parole, if he were sentenced to 25 years to life, or if he were sentenced to 30 years to life.

{¶ 304} Finally, Tench gave a brief unsworn statement. He admitted to having made bad decisions in his life that adversely affected the people he loves. He noted that he had lost his parents, his relationships with his sister and her children, and his dogs. He recognized that his mother's death affected many people, not just him. He described his mother as an angel and said he loves and misses her. He asked the jury to let him live out his life so he could "reflect and think about [his] losses" and his poor decisions and how they have affected others.

### C. Mitigating Factors

### 1. Statutory Mitigating Factors, R.C. 2929.04(B)(1) through (7)

{¶ 305} The mitigating factors set forth in R.C. 2929.04(B)(1) through (6), are inapplicable. Youth is not a factor: Tench was 27 at the time of the murder. *See State v. Frazier*, 61 Ohio St.3d 247, 258, 574 N.E.2d 483 (1991). Degree of participation is not a factor: he was the principal offender, indeed the sole offender. Having been convicted of robbery with a firearm specification, he does not claim

to lack a significant criminal record. There was no evidence that the victim induced or facilitated the murder, no evidence of duress, coercion, or provocation, and no evidence of mental disease or defect.[9] However, some of Tench's mitigating evidence, set forth above, is relevant under R.C. 2929.04(B)(7) (any other relevant factor).

### 2. Nature and Circumstances of the Offense

{¶ 306} The nature and circumstances of the aggravated murder offer nothing in mitigation.

### 3. History, Character, and Background

{¶ 307} Tench's history, character, and background contain scant mitigation. He came from an intact home. He described his mother as an angel. Although his father was short-tempered and hard to deal with, there was no evidence admitted at trial that Tench was physically abused and nothing to show how his relationship with his father affected him.

### 4. Additional Mitigating Factors

{¶ 308} Tench has the love, support, and loyalty of his friends and at least two relatives (Gregory Tench and Mary Pat Glover). That is a mitigating factor, but we give it little weight. The testimony of his friends credits him with generosity, kindness, caring, and trustworthiness. His conduct while incarcerated in the Cuyahoga County jail was good, and that is also a mitigating factor. His work record at Old Carolina Barbecue, as outlined by guilt-phase testimony, appears to have been generally good; his superiors characterized him as a good worker, and he earned a promotion from cook to assistant general manager.

---

[9] Tench had the services of two court-appointed psychologists. After conferring with them, reading their reports, and discussing the matter with Tench, defense counsel elected not to call the psychologists to testify in the penalty phase.

### D. Sentence Evaluation

### 1. Weighing of Mitigating Factors Against Aggravating Circumstances

{¶ 309} Nevertheless, we find that the two valid aggravating circumstances of which Tench was convicted outweigh the mitigating factors beyond a reasonable doubt. "In particular, the R.C. 2929.04(A)(8) witness-murder specification is entitled to great weight, for it 'strikes at the heart of the criminal justice system.' " *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 100, quoting *State v. Jalowiec*, 91 Ohio St.3d 220, 239, 744 N.E.2d 163 (2001).

### 2. Proportionality Review

{¶ 310} Finally, we find that Tench's death sentence is not disproportionate to the penalty imposed in similar cases. R.C. 2929.05. We have approved death sentences in cases involving only a kidnapping-murder specification. *See State v. Hartman*, 93 Ohio St.3d 274, 305-306, 754 N.E.2d 1150 (2001); *State v. Ballew*, 76 Ohio St.3d 244, 257-258, 667 N.E.2d 369 (1996); *State v. Joseph*, 73 Ohio St.3d 450, 462-463, 653 N.E.2d 285 (1995). In addition, we have approved death sentences "in cases where the witness-murder specification was present alone or in combination with one other specification, even when substantial mitigation existed." *Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 101 (citing cases); *see also Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, at ¶ 271.

### XII. Conclusion

{¶ 311} We reverse the trial court's judgment convicting Tench of aggravated robbery under Count 6 and of Specification 1 to Counts 1, 2, and 3, which alleged that Tench committed aggravated murder while committing aggravated robbery under R.C. 2929.04(A)(7). That specification is dismissed. *See State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 149. In all other respects, we affirm the judgment of the trial court regarding the convictions and sentences imposed, including the sentence of death.

Judgment affirmed in part
and reversed in part.

O'CONNOR, C.J., and O'DONNELL, FRENCH, FISCHER, and DEWINE, JJ., concur.

KENNEDY, J., concurs in judgment only in part and would affirm the judgment and sentence of the trial court.

_____

S. Forrest Thompson, Medina County Prosecuting Attorney, and Vincent V. Vigluicci, Assistant Prosecuting Attorney, for appellee.

Nathan A. Ray and George C. Pappas, for appellant.

_____